IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CARRIE JEAN LABAUVE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 03-0567-WS-B |
| | ) | |
| OLIN CORPORATION and | ) | |
| ARCH CHEMICALS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

This matter is before the Court on plaintiffs' Motion for Class Certification (doc. 119). The Motion has been exhaustively litigated, as the parties have submitted more than 200 pages of briefs and over 800 exhibits in support of their respective positions. The parties also presented live testimony and argument in a two-day class certification hearing spanning April 6 and 7, 2005. The Motion is now ripe for disposition. At this time, plaintiffs' Motion in Limine (doc. 168) to exclude defendants' evidence and argument regarding their statute of limitations defense will also be taken under consideration.

I.    **Background**.

A.    *Factual Overview.*

1.    *Olin's Operations in McIntosh.*

This putative class action arises from the operations of defendants Olin Corporation and Arch Chemicals, Inc., formerly known as Olin Specialty Chemicals (collectively, "Olin") in McIntosh, Alabama, which is located in Washington County approximately 40 miles north of Mobile. From 1952 through 1982, Olin operated a mercury cell chlor-alkali facility on a 2,200 acre site just west of a bend in the Tombigbee River, just south of a plant operated by Ciba-Geigy Corporation,[1] and just north and

---

[1]    Ciba is not a named defendant in this action. Plaintiffs' counsel have brought a separate putative class action (also pending before the undersigned) against that entity based on theories similar to those advanced here. *See Jesse Fisher, et al. v. Ciba Specialty Chemicals Corporation, et al.,*

east of residential and other privately owned property.

Olin's McIntosh facility utilized 256 mercury cells, each containing 4,000 pounds of mercury, as catalysts in the manufacturing process for chlorine and caustic soda. (Exh. P-11, at 53-54.) In simplified terms, the process worked as follows: Olin would dissolve salt from McIntosh's natural salt domes in water, forming a brine. Subjecting the brine to an electrolytic process would separate out chlorine and caustic soda, with a layer of mercury flowing over a steel plate to prevent the highly reactive end products from recombining. (*Id.* at 81-83.) In theory, this process would culminate in the mercury being recovered from the end products and returned to the production process, in a continuous recycle loop, akin to motor oil in an automobile. No mercury was to be consumed in Olin's production process; however, Olin documentation reflects that, particularly during the 1960s and 1970s, there was a substantial, ongoing loss of mercury at the McIntosh site through both known and unknown avenues (including, for example, spills, leaks, contaminated waste products and end products, vapors escaping through vents in mercury cell houses, and the like), at times exceeding 100 pounds of mercury per day. (Exhs. P-86, P-247, P-73, P-70.) In 1982, Olin shut down its McIntosh mercury cell chlor-alkali facility, switching to a different production process that does not utilize mercury.[2] In 1983, the Environmental Protection Agency designated Olin's McIntosh location a Superfund site. Since that time, the Olin facility has been subjected to federally mandated remediation studies and cleanup requirements under supervision of federal and state regulators. There is no dispute that the Olin

_____

Civil Action 03-0566-WS-B. Moreover, in a proposed amended complaint offered herein, plaintiffs would allege new causes of action predicated on alleged concerted fraudulent activity by Olin and Ciba to manipulate data and mislead regulators and the public as to the nature and extent of alleged environmental contamination in the vicinity of their McIntosh facilities. Although plaintiffs maintain that both Olin and the adjoining Ciba facility caused widespread contamination in and near McIntosh during the time period of interest, plaintiffs explained during the class certification hearing that Ciba's operations did not involve mercury, hence the parties' focus on that particular contaminant here.

[2]     Plaintiffs' evidence reflects that Olin continues to discharge mercury from its McIntosh site on a vastly reduced scale today. Indeed, in December 2002, Olin received a National Pollutant Discharge Elimination System ("NPDES") permit, authorizing discharge of a monthly average of 0.079 lbs/day of mercury in wastewater, for a five-year total discharge of 144 pounds of mercury. (Exh. P-76.) Plaintiffs have proffered no evidence that Olin is not in compliance with its NPDES permit today.

site was and is contaminated with mercury, but there is considerable debate as to whether and to what extent that contamination migrated offsite. (*E.g.*, Exh. P-2, at 57, 64, 70-71; Exh. P-4, at 191-92; Exh. P-9, at 110-11, 121, 129-30; Exh. P-12, at 169.)[3]

> 2.    *Alleged Mercury Contamination in McIntosh.*

Scientific evidence demonstrates that mercury is a toxic substance that does not degrade in the environment and is bioaccumulative. Exposure to mercury in sufficiently large concentrations may cause a variety of maladies in humans and animals, including injury to vital organs, neurological damage, and even death. This substance, which is naturally occurring, has an airborne and waterborne state, and may be found in soils, sediments, surface water, ground water, and in fish tissues. Mercury may be dispersed through wind, rain, water and dust, among other potential pathways.

The named class representatives in this action are Carrie Jean LaBauve, Daisy Mae Pressley, Lee Edward Jordan and Janice Reed Lofton.[4] All four class representatives live in the vicinity of Olin's McIntosh facility and are seeking recovery for alleged property damage on the theory that mercury contamination originating from Olin has diminished the value of their property. Plaintiff Jordan is also a commercial fisherman and seeks to recover for lost fishing opportunities based on alleged contamination of the Olin Basin and Tombigbee River.[5]

---

[3]    Plaintiffs' briefing of the history of events at the Olin facility frequently lapses into vituperative disparagement of defendants. For example, plaintiffs deride Olin's "corporate greed" and "arrogance," lambast its "profits over people corporate philosophy," accuse it of hiring a contractor "who enjoyed Olin's brand of deceit," characterize Olin as an "unrepentant polluter," and lament that "[t]here is no end to Olin's misconduct." (Plaintiffs' Brief, at 9, 28, 29, 33, 41, 44.) Such inflammatory rhetoric may be appropriate in a closing argument to a jury; however, it is distracting and unhelpful in the context of a class certification brief.

[4]    A fifth putative class representative, Joannee Barnes, was de-designated during the class certification hearing at plaintiffs' counsel's request, based on discovery of a potential conflict that might impair her ability to represent the class. (*See* doc. 176.)

[5]    Plaintiffs are not asserting claims for personal injury or adverse health consequences. Rather, their requested relief is confined to diminution of property value. Plaintiffs' counsel are addressing alleged health effects separately via a putative class action in New Jersey seeking medical monitoring costs, as well as individual lawsuits brought by individuals in the "zone of contamination"

According to plaintiffs, mercury from the Olin site has contaminated the surrounding community through several pathways. Plaintiffs utilize federal standards and Olin data to estimate that air vents in the roofs of the mercury cell-houses allowed in excess of 1300 grams of mercury vapor to escape into the atmosphere each day during the chlor-alkali plant's 30 years of operation.[6] Using a scientific air dispersion modeling technique and making certain assumptions regarding emission amounts, type of deposition (*i.e.*, wet vs. dry), and speciation rate (*i.e.*, relative proportions of elemental and reactive mercury), plaintiffs' air modeling expert, Dr. Erno Sajo, has estimated surface depositions of reactive gaseous mercury in a radius of 20 to 25 kilometers from the Olin plant during a 15-year period spanning 1957 through 1971. When converted from $g/m^2$ to parts per billion, Dr. Sajo's results show a small (1-2 km) ring of concentrations exceeding 600 ppb, a 5-7 km ring of concentrations exceeding 60 ppb, and a 20-25 km ring exceeding 6 ppb. (Hearing Transcript ("Tr."), at 468-69.)[7] This 20-25 km ring encircles and defines the proposed air subclass.

In addition to airborne deposition, plaintiffs contend that mercury has migrated beyond the

---

who have incurred serious health problems. *See Bobby Ware, et al. v. Ciba Specialty Chemicals, et al.*, Docket No. L-243-04 (N.J. Sup. Ct.) (putative class action seeking medical testing and monitoring for health effects related to alleged contamination from Olin and Ciba's McIntosh locations); *Earl W. Weaver v. Ciba Specialty Chemicals Corp., et al.*, Civil Action No. CV-2004-2494 (Mobile County Circuit Court) (individual action against Ciba and Olin seeking recovery for plaintiff's gastric cancer that he attributes to contamination in McIntosh); *Elias Et-Tawil, et al. v. Ciba Specialty Chemicals Corp., et al.*, Civil Action No. CV-2004-2495 (Mobile County Circuit Court) (individual action against Ciba and Olin seeking recovery for death of plaintiffs' minor child because of diffuse brain stem glioma, which plaintiffs attribute to contamination in McIntosh).

[6]     There appears to be no dispute that mercury vapor did escape through those vents, and that Olin was unable to measure with any degree of precision the rate of mercury loss through that pathway. Plaintiffs' estimates of the extent of mercury vapor loss are based on conservative assumptions, and appear eminently reasonable, at least at this stage of the proceedings. Of course, defendants are free to challenge those estimates at the merits stage.

[7]     Such conversions are necessary because Dr. Sajo's estimated depositional rates are two-dimensional, while measurement of mercury concentrations in soil requires a three-dimensional approach. Although they criticized the defense expert's conversion methodology, plaintiffs offer no calculations of their own to contradict his conversion figures.

boundaries of Olin property and into the community via surface water and groundwater flows. Plaintiffs point to evidence that from 1952 to 1974, Olin utilized the Olin Basin (a lake on Olin property and connected to the Tombigbee River by a channel) as a dumping area for wastewater and effluents, including mercury. Contamination in the Basin allegedly spread to the Tombigbee River by means of the channel enabling hydraulic communication between the two bodies of water, as well as the River's annual "flood stage," through which Basin and River waters are commingled. From 1974 to 1982, plaintiffs assert, Olin's wastewater ditch that had been releasing manufacturing byproducts into the Basin was redirected away from the Basin, such that its path flowed directly into the channel, and from the channel into the River. (Exh. P-2, at 268; Exh. P-10, at 46.) Aside from the River and Basin, plaintiffs maintain that Olin materials were transported offsite via numerous waterborne routes. For example, plaintiffs pointed to underground culverts and drainage ditches extending outward from Olin property to the south, under roads and into the community; piles of waste products, runoff from which traveled to beaver ponds and drained under roadways and into Bilbo Creek; and groundwater plumes radiating south and east of Olin's property into the McIntosh community.

Much attention has been devoted to "aggregate," a rock- or cement-like industrial waste material known by a host of monikers such as "well sands," "brine sands," "cementitious material," or even "competent pedon." Evidence reflects that this "aggregate" was actually sands pumped from Olin's brine wells in the 1950s and 1960s, before being moved offsite at a much later date. (Exh. P-12, at 69-70, 77-78, 201.) Dozens of truckloads of this aggregate were transported from Olin property (including a saw mill where the aggregate was apparently excavated during the construction process for a highway overpass) and deposited in several discrete locations in and around the McIntosh community at various times.[8] For example, aggregate was used as a road surface on at least

---

[8]     For purposes of the Rule 23 proceedings, the Court need not resolve whether Olin knew the aggregate was contaminated with mercury, whether it approved of the removal and use of that aggregate by third parties as a road-paving material and as a fill material in various offsite locations, and what liability it may have for such events. For present purposes, the Court accepts plaintiffs' evidence that the aggregate originated from Olin, that the aggregate was contaminated with mercury, and that aggregate was transported offsite by truck to several discrete locations in and around McIntosh for various uses.

portions of a 1.5-mile roadway, Allen Barnes Road (otherwise known as Salt Road), and as a "fill-in" material in several other locations, including the property of Dillard Covington and an area near the McIntosh water tank.[9]  Analysis of samples of this aggregate revealed high concentrations of mercury, many times greater than the reference or background values for mercury in the relevant community. The mercury in that cementitious material originated at Olin.  (Exh. P-12, at 119.)  Plaintiffs' expert civil engineer, Marco Kaltofen, opined that the aggregate was an industrial waste product emanating from Olin, and testified that it was a soft material that is degrading in the environment because of vehicle friction and weathering caused by wind and rain, all of which release mercury.  (Exh. P-16, at 188, 202, 206-07.)[10]  According to Kaltofen, mercury contamination in the aggregate is seeping into the environment in at least three respects: (1) vehicles traveling on Allen Barnes Road kick up mercury-laden dust, which then migrates in the wind; (2) crystalline particles of aggregate may be transported by surface waters to other locations during wet seasons; and (3) mercury in aggregate may have a volatile component with a vapor pressure, such that it may vaporize and be transported by air to other locations.[11]

---

[9]     Covington testified that approximately 40-50 truckloads of excavation material from the overpass site were hauled to his property.  (Exh. P-6, at 14; Exh. P-114, at ¶ 3.)

[10]    That said, the Court recognizes that defendants' toxicologist, Brad Droy, testified in his deposition that mercury in the aggregate is "very nonbioavailable" because testing revealed that it could not readily be extracted from or released by the aggregate.  (Exh. P-9, at 265-67.)  By contrast, plaintiffs' expert, Kaltofen, indicated that he would not "necessarily express the opinion that [mercury is] bound up with the aggregate," and instead opined that mercury was actually dispersing into the environment from the aggregate.  (Exh. P-16, at 191-92.)

[11]    Conceptually, plaintiffs have never explained the extent to which aggregate factors into the Class A subclasses for air, surface water and groundwater contamination.  They have provided no basis for estimating the geographic radius of aggregate-related contamination through any of these specified pathways.  Simply put, there is no evidence that the secondary effects of aggregate-related mercury contamination might be felt beyond the immediate vicinity of the aggregate deposits themselves. Even after wading through mountains of evidence, the Court has no way of knowing what effects (if any) the discrete aggregate deposits might have on class members' property values, as a whole. Rather, the evidence before the Court is that aggregate is a localized problem that may, at most, contaminate specific properties where it has been deposited, as well as perhaps parcels immediately

-6-

**B.    *Procedural Posture.***

    *1.    The Complaint.*

On August 25, 2003, plaintiffs filed their Class Action Complaint and Jury Demand (doc. 1), initiating this lawsuit against Olin.  In its present incarnation (as Plaintiffs' Third Amended Complaint (doc. 68)), the Complaint alleges state-law causes of action against defendants for negligence, absolute liability, strict liability, trespass, nuisance, conspiracy, intentional misrepresentation, negligent misrepresentation, fraud and fraudulent concealment, equitable and constructive fraud, and punitive/exemplary damages.[12]  From March 2004 through February 2005, the parties conducted bifurcated discovery, limited (in theory at least) to class certification issues.  Roughly 33 depositions were taken, and many thousands of pages of documents were exchanged.

On February 11, 2005, at the conclusion of class certification discovery, plaintiffs filed their Motion for Class Certification (doc. 119) pursuant to Rule 23, Fed.R.Civ.P.  Plaintiffs are requesting certification of two different classes, a property class (designated as Class A) and a fish class (designated as Class B).  Plaintiffs contend that they are seeking three forms of remedies, to-wit: (i) compensatory damages for diminution in property value; (ii) unjust enrichment arising from Olin's substantial cost savings by using plaintiffs' property "as its dumping ground for chemicals in lieu of

---

adjacent to Salt Road.  It is therefore unclear how this very isolated phenomenon can bolster plaintiffs' claims for classwide relief.  If anything, the presence of aggregate on a few discrete parcels of land in the McIntosh area injects significant individualized issues into the analysis because of its highly localized, isolated presence and effects.

    [12]    Also pending at this time is plaintiffs' Motion for Leave to File Fourth Supplemental and Amended Complaint (doc. 135).  If permitted, this amendment would introduce an additional cause of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), based on an alleged pattern of racketeering activity (including mail and wire fraud) carried out by Olin and Ciba to deceive the public about the nature and extent of contamination in McIntosh.  The parties have identified no rationale under which the grant or denial of the Motion to Amend would impact the Rule 23 calculus, and the Court is aware of none.  Accordingly, the Court defers resolution of the Rule 15 motion at this time, so as not to divert its attention from the class certification issues.

properly disposing of" same; and (iii) punitive damages.  (Plaintiffs' Brief, at 50-51.)[13]

2.    *The Proposed Classes.*[14]

Class A (the "Property Class") would consist of all property owners within a 20 to 25 kilometer radius of Olin's McIntosh facility, and would include (with limited exceptions) "[a]ll individuals or entities who owned residential, commercial, or agricultural real property, as of the date of certification of the class in this matter, in the geographic area surrounding the Olin McIntosh, Alabama facilities within the zone of contamination resulting from the release of hazardous substances" by Olin. (Plaintiffs' Brief (doc. 119), at 4.)  As contemplated by plaintiffs, Class A would be subdivided into three subclasses: an air subclass, a surface water subclass, and a groundwater subclass.  The air subclass would apparently include all Class A members whose property was within the zone of contamination for air deposition of mercury by Olin, as estimated in Dr. Sajo's air dispersion model. The isopleths of that air dispersion model define the contours of the 20-25 km ring around the Olin plant which plaintiffs would use to delineate membership in Class A.  As for the surface water subclass, it would include all Class A members whose property was subject to contamination by surface water runoff from Olin.  Plaintiffs offer no precise definition, geographic or otherwise, for the surface water subclass, but represent to the Court that "[t]he area of the surface water subclass is subsumed within

_____

[13]    Plaintiffs' announced claim for recovery on an unjust enrichment theory is peculiar, inasmuch as the operative Complaint neither identifies a cause of action for unjust enrichment nor specifically claims damages on that basis.  (*See* doc. 68.)  At most, the Third Amended Complaint merely alleges in passing that defendants have been unjustly enriched by their conduct, to the detriment of plaintiffs.  (Third Amended Complaint, ¶ 22.)  It is therefore not apparent that plaintiffs' demand for unjust enrichment has been properly presented.

[14]    The proposed classes and subclasses are in the form designated by plaintiffs, and it is not the place of this Court unilaterally to redraw the classification lines to fit its own view of the evidence.  *See Heaven v. Trust Co. Bank*, 118 F.3d 735, 738 (11th Cir. 1997) ("The district court has no *sua sponte* obligation to subclassify; it is the plaintiff's burden to designate an appropriate class.").  Therefore, the Rule 23 Motion must stand or fall based on plaintiffs' proposed class dimensions, which the Court cannot and will not reconfigure.

the boundaries of the air subclass." (*Id.* at 7.)[15] Finally, a groundwater subclass would apparently encompass all owners of property subject to groundwater contamination. Plaintiffs acknowledge that they lack sufficient information to document the extent of offsite groundwater contamination or to define the groundwater subclass, but urge the Court to conditionally certify such a subclass "subject to further definition and refinement" at a later date, and "likely" lying within the boundaries of the air subclass. (*Id.* at 8-9.)

As a separate class, plaintiffs seek certification of Class B (the "Fish Class"), which they define as consisting of "all commercial, recreational, or subsistence fishermen who, as of the date of certification of this class in this matter, fished in the natural basin known as the Olin Basin or in the Tombigbee River within the geographic boundaries of Class A." (*Id.* at 9.)

### 3. *The Class Certification Hearing.*

The Motion for Class Certification was briefed extensively, with plaintiffs offering 155 pages of briefing in support of their motion, and defendants submitting a 48-page memorandum in opposition. Moreover, the parties ultimately designated and marked over 800 exhibits for the class certification hearing (including more than 600 by defendants, and 200+ by plaintiffs).[16] A class certification hearing was conducted on April 6 and 7, at which time the Court heard lengthy opening statements from each

---

[15]    Plaintiffs have provided no isopleths, footprints, maps or charts that would identify the boundaries of the surface water subclass, nor have they offered a means for determining whether a particular property owner's lands have been contaminated via the surface water pathway. It is therefore unclear how this subclass would be defined, other than by reference to the computational air dispersion model relating to the air subclass.

[16]    The Court is dismayed by the unchecked proliferation of exhibits that the parties indiscriminately discharged into the Rule 23 record. After all, plaintiffs' Motion for Class Certification was supported by 53 exhibits (with an additional 20 exhibits submitted with their reply brief), and defendants' opposition brief was supported by 40 exhibits. The Court is at a loss to understand how this substantial but manageable corpus of documents mutated into a staggering 828 exhibits spanning 27 large three-ring binders (including 18 3¼-inch binders and 9 4-inch binders, constituting an agglomeration of paper standing several inches taller than the 7'6" Houston Rockets center Yao Ming) for purposes of a two-day Rule 23 hearing. Even more mysterious is why the vast majority of these items were injected into the record at all, when counsel referenced them neither in their 200 pages of briefing nor in their presentations at the class certification hearing.

side, and received testimony from five witnesses (all of them experts), three on behalf of plaintiffs and two on behalf of defendants.

In the wake of the hearing, it was evident that the parties had clogged the record with innumerable unnecessary materials that were irrelevant, redundant or of peripheral significance to issues implicated by the Motion. Of course, the parties may not, by the simple expedient of dumping an undifferentiated mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions.[17] Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it." *Resolution Trust Corp. v. Dunmar Corp*., 43 F.3d 587, 599 (11th Cir. 1995). For that reason, the Court directed the parties, with the aid of the official hearing transcript, to designate specific exhibits and specific portions of deposition transcripts they wished to be considered, so as to eliminate extraneous materials from their enormous evidentiary submissions. The parties having undertaken at least superficial efforts to comply, the Motion is now properly before the Court for disposition.[18]

_____

[17]     *See, e.g., Witbeck v. Embry Riddle Aeronautical University, Inc.*, 219 F.R.D. 540, 547 (M.D. Fla. 2004) ("That judges have no duty to scour the file in search of evidence is an obvious corollary to the requirement that parties specifically identify the portions of the case file which support their assertions."); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) (federal courts "are wary of becoming advocates who comb the record of previously available evidence and make a party's case for it"); *Nicholas Acoustics & Specialty Co. v. H & M Const. Co.*, 695 F.2d 839, 846-47 (5th Cir. 1983) ("practical constraints on the time of a judge make it impossible for the judge to examine a record of even moderate size with such finitude as to be both exhaustive and exhausting").

[18]     Although the Court will address the merits of the Motion for Class Certification at this time, the parties' efforts to "pare down" the sprawling, grossly excessive record have been unsatisfactory. Even after the post-hearing designations, the Court remains inundated with thousands of pages of documents, most of which were referenced in neither the briefs nor at the Rule 23 hearing. The overwhelming majority of these materials cover merits-related disputes or collateral issues, or are simply cumulative of other materials in the file, rendering many exhibits devoid of meaningful application to the instant analysis. Yet the parties have squandered judicial resources by imposing on the Court to sift through reams of detritus on their behalf to locate potentially relevant, significant items. For example, the designated portions of John Van Conner's deposition (Exh. P-5) consist of dozens of pages of excerpts dealing almost exclusively with the alleged Ciba/Olin conspiracy to manipulate data. Likewise, the designated portions of Michelle McFaddin's deposition (Exh. P-20) deal almost exclusively with expert opinions as to Olin's regulatory compliance or lack thereof, and substantial

## II.    Legal Standard for Class Certification.

Plaintiffs' Motion for Class Certification is governed by the standards set forth in Rule 23, Fed.R.Civ.P.  *See Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003) (explaining that Rule 23 furnishes the "legal roadmap" which courts must follow in assessing propriety of class certification).  "For a district court to certify a class action, the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements set forth in Rule 23(b)."  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004); *Valley Drug*, 350 F.3d at 1188 ("Failure to establish any one of [the Rule 23(a)] factors and at least one of the alternative requirements of Rule 23(b) precludes class certification").  It is well established that "[t]he burden of proof to establish the propriety of class certification rests with the advocate of the class."  *Valley Drug*, 350 F.3d at 1187; *see also London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003).  A district court's

---

designated excerpts from William Sawyer's deposition (Exh. P-30) address the effects of Olin's activities on human health.  While such evidence may (or may not) be highly relevant at a trial on the merits, the Court perceives no more than a tangential connection between these materials and the pending Rule 23 issues.

Even more egregious are the parties' designations of exhibits.  The same party has frequently designated multiple copies of the same exhibit (sometimes three or more), taking undue liberties with the Court's time in obliging it to parse through such redundancies.  Further, the parties offer undifferentiated designations of lengthy documents, without earmarking particular excerpts.  For example, all parties designate Exhibit D-462, a 638-page Remedial Investigation Report, in its entirety, but fail to provide any inkling as to which portions of the Report are germane to the Rule 23 inquiry.  Presumably, they intend for the Court to spend a day or two reviewing Exhibit D-462 in detail, ruminating on its meaning, and speculating as to how each side intends to utilize it in support of their Rule 23 position.  Such an evidentiary strategy is unreasonable.

If Shakespeare is correct that discretion is the better part of valor, then it is also the better part of advocacy.  The Court understands that this case is highly document-intensive and that the parties have expended prodigious resources collecting documents.  However, simply because the parties have these materials in their possession does not confer upon them license to dump them willy-nilly into the record and expect the Court to divine their significance.  It is incumbent on the parties to organize their case, to separate wheat from chaff, and to present their positions efficiently and concisely.  Their profligate designation of depositions and exhibits runs directly contrary to those obligations.  The net result is that a relatively straightforward Rule 23 Motion has been transformed into a vast time sinkhole, wasting unfathomed judicial resources and delaying other court business.

ruling on a class certification motion will be reviewed on appeal for abuse of discretion. *See Cooper v. Southern Co.*, 390 F.3d 695, 711 (11th Cir. 2004) ("Questions concerning class certification are left to the sound discretion of the district court."); *Murray v. U.S. Bank Trust Nat'l Ass'n*, 365 F.3d 1284, 1288 (11th Cir. 2004); *Hines v. Widnall*, 334 F.3d 1253, 1255 (11th Cir. 2003) (district court decision on class certification will not be disturbed as long as it remains within Rule 23 parameters, even if appeals court would have resolved issues differently).[19]

The Rule 23(a) requirements are as follows: (i) numerosity, such that "the class is so numerous that joinder of all members is impracticable"; (ii) commonality, such that "there are questions of law or fact common to the class"; (iii) typicality, such that representative plaintiffs' claims are typical of those of the class; and (iv) adequacy, such that the representative plaintiffs "will fairly and adequately protect the interests of the class." Rule 23(a), Fed.R.Civ.P.; *Prado-Steiman v. Bush*, 221 F.3d 1266, 1278 (11th Cir. 2000) (describing numerosity, commonality, typicality and adequacy elements). The purpose of Rule 23(a) is to ensure that the bond between class representatives and other class members is sufficiently strong to warrant lashing the fortunes of all class members to the named representatives. *See Cooper*, 390 F.3d at 713; *see also Wright v. Circuit City Stores, Inc.*, 201 F.R.D. 526, 535 (N.D. Ala. 2001) (explaining that Rule 23(a) "acts as a lens through which the court looks to ensure that the interests and claims of the representative plaintiff match those of the putative class"). A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *see also Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 696 (S.D. Fla. 2004) (similar); *Rhodes v. Cracker Barrel Old Country Store, Inc.*, 213 F.R.D. 619, 671 (N.D. Ga. 2003) (rather than accepting plaintiffs' evidence and argument at face value, Rule

---

[19] Notwithstanding the discretion conferred upon it in addressing class certification issues, the Court is cognizant of the Eleventh Circuit's recent admonition, apparently applicable to both web-slinging comic book characters and federal district courts, that "with great power comes great responsibility." *Klay*, 382 F.3d at 1251. Accordingly, the undersigned acts with considerable circumspection and deliberation in applying the Rule 23 framework.

-12-

23 requires district court to perform a rigorous analysis).[20]

Even if the Rule 23(a) prerequisites are satisfied, class certification is permissible only if plaintiffs also satisfy one or more prongs of Rule 23(b). Here, plaintiffs invoke Rule 23(b)(3), which requires findings that common questions of law or fact predominate over questions affecting only individual members, and that a class action is superior to other methods for fair and efficient adjudication of the controversy.

In performing the Rule 23 analysis, the Court may not inquire into the merits of plaintiffs' claims at this preliminary stage. *See, e.g., Cooper*, 390 F.3d at 712 (repeating well-worn admonition that Rule 23 does not confer upon a court authority to conduct preliminary merits inquiry in making class certification determination); *Morrison v. Booth*, 763 F.2d 1366, 1371 (11th Cir. 1985) (concurring with district court's assessment that it "could not conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action").[21]  Nonetheless, in conducting the requisite "rigorous analysis," the district court may look beyond the allegations of the Complaint to consider the parties' supplementary evidentiary submissions, which in this case amounts to hundreds of exhibits and two days of live testimony. *See Wright*, 201 F.R.D. at 534 ("In determining whether to certify a class, a court may consider both the allegations of the complaint and the supplemental evidentiary submissions of the parties.").

Moreover, the Court recognizes that this is a highly expert witness-intensive case, as all five witnesses called to testify during the class certification hearing were experts. The Court has previously

---

[20]    To the extent that plaintiffs rely on pre-*Falcon* authorities in support of a more liberal or lenient standard than the "rigorous analysis" required by the Supreme Court, the Court declines to adopt them here.  (*See* Plaintiffs' Brief, at 58-59.)

[21]    It is also true, however, that merits and Rule 23 issues are often intertwined, rendering it impossible to address the Rule 23 criteria without at least tangential discussion of the merits. *See Cooper*, 390 F.3d at 712; *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir. 1984) (prohibition on merits determinations at Rule 23 stage "should not be talismanically invoked to artificially limit a trial court's examination of the factors necessary to a reasoned determination" under Rule 23).  On that basis, the *Cooper* court reasoned that a trial court does not erroneously reach the merits of the litigation simply by dint of making an informed assessment of the parties' evidence at the class certification stage. *See* 390 F.3d at 712-13.

ruled in this case that a full-blown *Daubert* investigation is premature at the class certification stage.

*See Drayton v. Western Auto Supply Co.*, 2002 WL 32508918, *6 n.13 (11th Cir. Mar. 11, 2002)

(finding that court need not "perform a *Daubert* inquiry of scientific evidence at this early stage of a

class action proceeding," but may instead "address this issue as this case progresses"); *In re Visa*

*Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 132 n.4 (2nd Cir. 2001) (noting that "a

motion to strike expert evidence pursuant to *Daubert* ... involves an inquiry distinct from that for

evaluating expert evidence in support of a motion for class certification," and that *Daubert* motions are

typically not made until summary judgment or trial). Thus, in reviewing proffered expert testimony for

class certification purposes, the Court's examination is confined to ensuring "that the basis of the expert

opinion is not so flawed that it would be inadmissible as a matter of law." *Visa Check*, 280 F.3d at

135 (only question is whether expert evidence is sufficient to demonstrate common questions of fact

warranting certification of proposed class, not whether such evidence will ultimately be persuasive); *see*

*also In re Polypropylene Carpet Antitrust Litigation*, 996 F. Supp. 18, 26 (N.D. Ga. 1997) (during

class certification proceedings, judicial inquiry is limited to determining whether expert testimony

comports with basic scientific principles, has any probative value, and primarily uses evidence common

to all class members). If that threshold is satisfied, then all proffered expert testimony will be weighed

and considered at the Rule 23 stage.[22]   Under no circumstances may a district court "weigh conflicting

expert evidence or engage in 'statistical dueling' of experts" for Rule 23 purposes. *Visa Check*, 280

F.3d 135. The parties' expert witness evidence will be evaluated in recognition of these bedrock

principles.

### III.    Standing of Named Plaintiffs to Represent the Putative Class as to Class A.

"[I]t is well-settled that prior to the certification of a class, and technically speaking before

undertaking any formal typicality or commonality review, the district court must determine that at least

---

[22]     The parties were alerted prior to the class certification hearing that this Court would
apply the *Visa Check* standard in considering expert testimony, and that no expert witness would be
disallowed at this stage so long as that threshold was satisfied. *See* Order dated March 31, 2005 (doc.
167). Thus, all participants in the hearing knew that a rigorous *Daubert* analysis would not apply to
proffered expert testimony at this juncture.

one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman*, 221 F.3d at 1279. Simply put, a plaintiff cannot represent a class unless he first shows that he has standing to raise the claims of the class he seeks to represent. *See Murray*, 365 F.3d at 1288 n.7. "[A]ny analysis of class certification must begin with the issue of standing." *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987); *see also Hines*, 334 F.3d at 1256. In *Prado-Steiman*, 221 F.3d at 1280, for instance, the appellate court vacated class certification and remanded with instructions that the lower court determine whether at least one named representative of each class or subclass had standing for each proffered claim.[23] Two particular elements of standing are of vital importance in the case at bar, to-wit: (i) whether the named plaintiffs have sustained an injury in fact; and (ii) whether their claims are timely.

      **A.**     ***Injury-in-Fact Requirement.***

            1.     *Legal Standard.*

      In order to have standing, a plaintiff "must have suffered in injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1251 (11th Cir. 2003) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *see also Lewis v. Casey*, 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (applying principles of standing to explain that "[i]t is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm"); *Church v. City of Huntsville*, 30 F.3d 1332, 1340 (11th Cir. 1994) (class lacks standing unless at least one named plaintiff is in real and immediate danger of being personally injured by challenged practice); *Lynch v.*

---

[23]     The Court recognizes that certain decisions discuss standing within the context of the Rule 23(a) typicality requirement, while others view it as a freestanding determination divorced from Rule 23(a) issues. *Compare City of Hialeah, Florida v. Rojas*, 311 F.3d 1096, 1101 (11th Cir. 2002) (describing standing and Rule 23 as distinct prerequisites for class action suits, and declining to address Rule 23 at all upon determination that standing was lacking) *with Hines*, 334 F.3d at 1256 (analyzing standing in context of Rule 23(a) typicality discussion). This distinction appears to be one of semantics and is immaterial to the analysis herein. Either way, class certification may not be granted if the named plaintiffs lack standing to raise the claims at issue.

*Baxley*, 744 F.2d 1452, 1456 (11ᵗʰ Cir. 1984) (observing that if a named plaintiff does not show that he has sustained or is immediately in danger of sustaining a real, direct injury that is not conjectural or hypothetical, then he may not seek relief on behalf of the class); *Drayton*, 2002 WL 32508918, at *2 (indicating that standing requires plaintiffs to establish that they were injured, and that at least one named plaintiff must have personally suffered injuries giving rise to each claim); *see generally Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1003 (11ᵗʰ Cir. 2004) (defining injury in fact as "a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical").

2.       *Plaintiffs' Mercury Testing.*

As discussed previously, Carrie Jean LaBauve, Daisy Mae Pressley, Lee Edward Jordan and Janice Reed Lofton are the named plaintiffs in this action. Each of them owns property near Olin's facility in McIntosh, in proximity ranging from less than 1 mile (in the case of plaintiff Pressley) to approximately 12 miles away (in the case of plaintiff Jordan). (*See* Exh. D-528; D-533; D-536; D-542; D-545).[24] Following the filing of this lawsuit in August 2003, plaintiffs retained a civil engineer, Marco Kaltofen, to collect samples of soils, dust, sediment, air, water, fish tissues, aggregate, other biological materials (*i.e.*, pine needles), and polyurethane foam in and around McIntosh for mercury testing. (Tr., at 222-23.) Kaltofen collected samples from the McIntosh area at six different intervals, between December 2003 and August 2004. (*See* Exh. D-432.)[25] A number of these samples were taken on or near plaintiffs' property.

In interpreting the test results for these samples, plaintiffs' and defendants' experts agreed that it is necessary to place them in context by comparing them to background, or reference, mercury values.

_____

[24]       All plaintiffs' property appears to be within approximately 3 miles of the facility, with the exception of plaintiff Jordan, whose property is approximately 12 miles due south of the Olin plant on Highway 43. (*See* Exh. D-528.)

[25]       Plaintiffs' toxicologist, Dr. William Sawyer, testified that Kaltofen's sampling protocol "was highly appropriate for the assessment of human health risks." (Exh. P-30, at 193.) Of course, the damages claimed in this cause of action proceed from alleged property devaluation, not elevated risk of harm to human health, so the propriety of his methodology for assessment of property damage is unclear.

-16-

(Tr., at 219-20, 360-62.)[26]  A background value is the "natural level" or "the level of constituent of concern absent any kind of contamination or other industrial source."  (Exh. P-16, at 62.)  The Kaltofen report assigned a background mercury value for soils in the McIntosh area of approximately 60-80 parts per billion ("ppb").  (*See* Exh. D-432, at 9; Tr., at 210-11, 231-32, 286.)[27]  Thus, observed mercury concentrations of 80 ppb or less may not reasonably be attributed to wrongdoing by Olin; rather, a given soil sample may only yield an inference of Olin-related contamination to the extent that it exceeds that threshold.  Stated differently, Kaltofen's background level of 60-80 ppb is intended to capture general natural and human activities (other than Olin) in the McIntosh area, and Olin contamination may be inferred only in soil mercury readings exceeding 60-80 ppb.  (Tr., at 210-11, 218-19.)[28]

---

[26]    Stated differently, mercury concentrations in soil samples taken in McIntosh, Alabama would not be expected to show zero mercury in the absence of contamination by Olin.  There are at least three reasons why this is true.  First, mercury is a naturally occurring substance; therefore, it is found in natural abundance of 10-50 ppb, even without human activity.  (Tr., at 210-11, 218.)  As one witness colorfully put it, "[t]he tooth fairy didn't bring mercury.  It exists in the crust of the earth."  (Exh. P-23, at 291.)  Second, other local industrial and commercial activities in nearby areas may emit mercury, a portion of which may be deposited in McIntosh soils even with no contamination by Olin.  (Tr., at 137, 154.)  Third, mercury contamination is a worldwide problem, and elemental mercury released from sources as distant as China and Russia may be deposited in Alabama soils.  (*Id.* at 153-54.)  Accordingly, the data collected by Kaltofen has meaning vis a vis Olin's activities only if compared to the appropriate background level.  (*See* Exh. D-190.)

[27]    According to the U.S. Geological Survey, the average concentration of mercury in soil is 80 ppb.  (Exh. P-23, at 290.)  Defendants' expert, William Hall, presented evidence and testimony that the background level of mercury in the McIntosh area is approximately 170 ppb, and that any concentration between 40 and 420 ppb may reasonably be deemed in the realm of background.  (Tr., at 361-64.)  Hall pointed to mercury readings within 100 km of the Olin plant ranging from 40 to 90 ppb north of McIntosh, to 110 to 420 ppb south of McIntosh.  (*See* Exh. D-529.)  The Court does not weigh or decide between conflicting expert testimony for class certification purposes; therefore, the Court will adopt and consider Kaltofen's 60-80 ppb background level, rather than Hall's substantially higher estimates, for this Rule 23 analysis.

[28]    Of course, it is not necessarily true that <u>all</u> readings above 60-80 ppb reflect contamination by Olin.  To the contrary, it is possible that location-specific activity (for example, storage of batteries, mercury switches, thermometers, fluorescent light bulbs) or other industrial sources

Although plaintiffs took scores of samples, they only took one from plaintiff Lofton's property, located on John Johnston Road roughly 1.5 miles west of the Olin plant.  (D-522, D-533.)  The Lofton sample, a dust sample taken from her refrigerator coils,[29] came back with a reading of "non-detect," meaning that the mercury concentration in that dust was below 40 ppb, the minimum detection level for the particular protocol utilized by the testing laboratory retained by plaintiffs.  (Exh. D-432, at 5; Exh. D-533.)[30]  Thus, the lone sample taken from the Lofton property reveals no detected mercury at all, implying that whatever minuscule amounts of mercury may have been in that sample were present at levels well within expected background concentration.  The level of mercury found at the Lofton property falling short of plaintiffs' expert's background value, there is no evidence that the Lofton property is presently contaminated by mercury emanating from the Olin facility.

Similarly, there is no evidence that the property of plaintiffs LaBauve or Jordan is presently contaminated by Olin mercury.  Plaintiff LaBauve owns two pieces of property in and around McIntosh, including a tract on Topton Road, approximately 1.1 miles northwest of the Olin facility, and a parcel on John Johnston Road, approximately 3.2 miles west of the Olin facility.  (Exh. D-522; D-542; D-545.)  Kaltofen tested the well water and soil on the LaBauve property on John Johnston

---

(power plants, incinerators, etc.) may account for an elevated reading at a particular site.  The point is that observed mercury concentrations of 60-80 ppb or below at a particular site are consistent with those expected in the absence of any Olin contamination, and therefore cannot establish an injury in fact for plaintiffs here.

[29]    Refrigerator coils are a valuable source for collecting house dust samples for mercury testing because they give a good historic look at the composition of dust in a home.  (Tr., at 294.)

[30]    This evidence appears irreconcilable with Dr. Sawyer's deposition testimony that "all of the homes tested were contaminated within a range of 56 to 460 -- to 1200 part[s] per billion."  (Exh. P-30, at 217.)  Nonetheless, a dust sample taken by Kaltofen at the Echols residence approximately 1/4 mile west of the Lofton property, also on John Johnston Road, yielded a mercury reading of 110 ppb.  (Exh. D-533, D-534, D-432 at 4.)  No one in the Echols household is a putative class representative in this action.

Road, but all samples came back with "non-detect" readings.  (Tr., at 229-30.)[31]  There is no evidence that plaintiffs performed testing of any kind at LaBauve's Topton Road property, and defendants' evidence is that no such tests occurred.  (*See* Exh. D-544 ("No samples at LaBauve Topton Property").)[32]  Likewise, there is no evidence that plaintiffs ever performed any mercury testing in or near plaintiff Jordan's property.[33]

    With regard to plaintiff Pressley, however, plaintiffs' testing data did reveal an above-

---

[31]    The record reflects an incongruity on this point.  In their brief filed in opposition to class certification on March 11, 2005, defendants advised the Court that "[t]he properties of Ms. LaBauve ... have not yet been tested for mercury."  (Opposition Brief (doc. 138), at 9.)  Yet in both opening statements and in cross-examination of Kaltofen on April 6, 2005, defendants represented that plaintiffs had tested LaBauve's property on multiple occasions for mercury and that the samples had been found to be "non-detect" in all instances.  (Tr., at 43, 229-30.)  Defendants' exhibits reflect that plaintiffs tested two caches of aggregate on the LaBauve property on John Johnston Road a total of four times, and that all four tests returned values of "non-detect" for mercury.  (*See* Exh. D-547.)  In light of this evidence, and because Kaltofen acknowledged on cross-examination that such was the case, the Court accepts for Rule 23 purposes that multiple tests performed on LaBauve's property divulged no mercury concentrations exceeding background levels.

[32]    Not only did plaintiffs fail to test plaintiff LaBauve's Topton property, but the only four samples in the immediate vicinity of that property were tested as having, at most, negligible concentrations of mercury.  Plaintiffs tested an aggregate sample one- or two-tenths of a mile west of the Topton property, but it returned a "non-detect" result.  Plaintiffs also tested one surface water sample and two soil samples a similar distance to the west of the Topton property.  The surface water sample was a nondetect, and the soil results were between 24.5 and 27.9 ppb, or well within the 60-80 ppb background value.  Thus, in addition to there being no evidence of contamination on plaintiff LaBauve's Topton property, there is no evidence of substantial mercury deposits at multiple testing sites in close proximity to that property.

[33]    This fact is unsurprising, given plaintiffs' apparent intent to utilize Jordan as a representative plaintiff for Class B (the fish class), rather than Class A (the property class).  Jordan's property is considerably further away from the Olin plant than is that of the other named plaintiffs, such that Dr. Sajo's model would predict relatively modest air deposition of mercury on that property of between 6 and 60 ppb.  Additionally, Jordan is a commercial fisherman by trade, cementing his role as representative plaintiff for Class B.  Plaintiffs have never specified whether they intend for Jordan to be considered as a representative plaintiff for Class A at all.  To afford the plaintiffs the benefit of every possible doubt, notwithstanding their failure to designate which class or classes plaintiff Jordan is representing, the Court will assess Jordan's standing to represent Class A, as well as Class B.

-19-

background concentration of mercury. A dust sample from the refrigerator coils of Pressley's home, located on Pressley Road approximately 0.9 miles south of the Olin plant, had a mercury concentration of 170 ppb, or approximately double the background value. (Exh. D-536; D-537; D-538; D-432, at 5.) No other testing was performed at Pressley's residence.

3.     *Plaintiffs LaBauve, Jordan and Lofton Have Not Suffered an Injury in Fact, and Therefore Lack Standing.*

As demonstrated by the foregoing discussion, plaintiffs have come forward with no evidence that the properties of plaintiffs LaBauve, Jordan and Lofton are presently contaminated with mercury. There has been no showing that levels of mercury at any of these locations exceed background levels for McIntosh and southern Alabama, generally. Plaintiffs do not contend and certainly have not offered evidence that plaintiffs LaBauve, Jordan and Lofton are experiencing elevated levels of mercury at their properties today.[34]

Nonetheless, plaintiffs insist that LaBauve, Jordan and Lofton possess standing as to the Class A claims because their properties lie within the "zone of contamination" as reflected by Dr. Sajo's air dispersion model. Plaintiffs reason that Dr. Sajo's model shows that mercury was "deposited upon all of the properties within an approximate 25 km radius from the Olin plant from 1952 to 1982. All of the properties of the named Plaintiffs are within this confirmed zone of contamination." (Reply Brief, at 10 (emphasis omitted).)[35] The Court accepts for Rule 23 purposes that Dr. Sajo's model is a scientifically

_____

[34]     In her deposition, plaintiff LaBauve admitted that it "would be nice" if testing revealed no contamination on her property. (Exh. P-18, at 158.) That is precisely what happened, yet she continues to represent the class.

[35]     Defendants expended much energy during the hearing and in pre-hearing briefing attacking the legitimacy of Dr. Sajo's results. In particular, defense counsel denounced Dr. Sajo's work because he compared the model's predictions to only a handful of field data points and because many of his predicted mercury concentrations are considerably higher than measured mercury levels in field data. In response to this withering critique, Dr. Sajo steadfastly maintained that his model had been scientifically validated and peer-reviewed by the EPA, that all data points were within expected uncertainties for the model, and that any discrepancies between model predictions and observed field results did not imply that the model had failed. (Tr., at 127-28, 132, 140, 151-52.) Notwithstanding the defense's criticisms, the Court readily concludes that Dr. Sarno's testimony was not "so flawed that it would be inadmissible as a matter of law." *Visa Check*, 280 F.3d at 135. Therefore, the Court

-20-

valid tool for estimating the pattern and quantity of airborne mercury deposition from the Olin facility in the McIntosh area during the time frame of January 1957 through December 1971, the 15-year interval that he purported to model. (Exh. P-46) However, to accept that Dr. Sajo's model is a valid means of estimating where and how much mercury fell 35-50 years ago is not to say that plaintiffs LaBauve, Jordan and Lofton have an injury in fact today. Dr. Sajo readily conceded that he made no attempt to model or account for human activities or any activity other than normal atmospheric processes. (Tr., at 120, 132.) Moreover, he made no pretense of suggesting that the model specifies with exactitude the amount of mercury actually deposited on a particular site; to the contrary, Dr. Sajo explained that predicted uncertainties from his model could result in mercury deposition at a particular location (or at all locations) that departs from the model's estimates by a factor of five. (*Id.* at 99-107.)

Thus, even accepting Dr. Sajo's model as valid and correct, we would expect to see enormous disparities between forecast concentrations and observed mercury readings at particular sites within the purported "zone of contamination" for two reasons. First, the model's high uncertainty rates mean that certain sites predicted to receive substantial mercury deposition might actually have received negligible mercury deposition during the time period studied.[36] Second, human activities in intervening decades

_____

considers Dr. Sajo's testimony for class certification purposes, notwithstanding the defense's *Daubert*-style objections.

[36]    In this regard, plaintiffs' contention that Dr. Sajo's model proves that every property within the "zone of contamination" received substantial airborne mercury deposition is flawed. Dr. Sajo testified during the Rule 23 hearing that the model was within accepted bounds of uncertainty even if predicted mercury deposition exceeded actual deposition by 500% at all locations. (Tr., at 107, 152.) Given these large uncertainties, it would be neither surprising nor unexpected for particular locations within that zone to have received negligible mercury deposition from Olin via the air pathway during the 1957 to 1971 period studied by Dr. Sajo. For example, along the perimeter of the orange area on Dr. Sajo's map, the model predicted mercury concentrations of 60 ppb, according to conversion computations by defense expert, Jeff Harrington. (Tr., at 468-69.) Applying Dr. Sajo's testimony regarding uncertainty, even an actual mercury deposition of 12 ppb (a tiny amount given background concentrations in the 60 - 80 ppb range, and well below the minimum detection level of plaintiffs' testing) at those locations would have been well within the model's expected tolerances. Or a mercury deposition of just over 1 ppb would have been within Dr. Sajo's expected tolerances along the perimeter of the yellow area of his chart. Such *de minimis* quantities are trivial and cannot seriously give rise to viable property damage claims.

-21-

may have disturbed the mercury deposits, drastically changing the composition of the soil at certain locations, and potentially alleviating any mercury contamination that might have existed at particular sites during the 1957-1971 period modeled by Dr. Sajo. Simply put, Dr. Sajo's model does not warrant a conclusion that plaintiffs' properties were substantially contaminated by Olin mercury via air deposition 35-50 years ago, much less that those properties are actually contaminated by mercury from that pathway today. This finding necessarily implies the legal conclusion that Dr. Sajo's model, without more, fails to prove the requisite "injury in fact" for plaintiffs LaBauve, Jordan, and Lofton.

Aside from Dr. Sajo's model, plaintiffs attempt to show injury in fact by alleging that they are in imminent danger of serious harm through the mercury released by Olin from 1952 through 1982. (Reply Brief, at 10-12.) Plaintiffs offer extensive evidence that Olin lost thousands of pounds of mercury through vapor, leaks, spills, and various other avenues during that time period. Certainly, that mercury had to go somewhere. Plaintiffs' evidence – which the Court accepts for Rule 23 purposes – shows that mercury found its way into the community through at least four pathways. First, it is reasonable to infer from Dr. Sajo's testimony that at least a portion of Olin's mercury vaporized, was transported by air, dispersed offsite and deposited in the surrounding community. Second, plaintiffs' evidence regarding mercury-laced aggregate transported from Olin property into McIntosh and used to pave a road and provide excavation fill at various discrete locations shows that Olin mercury has entered the McIntosh community through that mechanism. Third, evidence of elevated mercury concentrations in drainage ditches on public property adjacent to Olin property suggests that surface runoff has transported Olin mercury into the McIntosh community in that manner. Fourth, plaintiffs have shown elevated concentrations of mercury in groundwater at the Olin facility at certain times, suggesting that underground aquifers may have transported some of that mercury offsite.

Mercury having reached the community through these pathways, plaintiffs argue, all property in the "zone of contamination" faces imminent and substantial endangerment of mercury contamination. Mercury does not degrade in the environment. Furthermore, atmospheric, natural and human forces may mobilize mercury, causing secondary movement of mercury after it is initially deposited. (Tr., at

164-65.).[37]  To make this point, plaintiffs repeatedly return to the graphic example of heavy trucks rolling over the aggregate-paved Allen Barnes Road, dislodging and disseminating purportedly toxic clouds of high-mercury dust which may radiate out into adjacent areas.  (Tr., at 179-80.)

Thus, plaintiffs' theory that all plaintiffs face a present threat of imminent harm of mercury contamination to their properties ultimately rests on the following syllogism: (i) mercury from Olin is presently dispersed within the McIntosh community; (ii) mercury does not break down in nature, and may experience secondary movement; and (iii) therefore, everyone within the McIntosh community faces a present threat of imminent harm of mercury contamination to their properties, even if their property has no mercury today.  The principal defect with this logic is that it is hypothetical and conjectural.  Plaintiffs have posited no evidence that the properties of LaBauve, Jordan and Lofton face a real, actual, imminent risk of mercury contamination.  There has been no showing that secondary movement has caused, or is capable of causing, radical shifts in observed mercury levels at particular sites in McIntosh from one day to the next, from one month to the next, or even from one year to the next.  In other words, plaintiffs have not quantified (or even attempted to quantify) this secondary movement effect to show that it poses any legitimate threat to overall mercury concentrations at particular locations.[38]  Plaintiffs have offered no test results showing that mercury readings may be low on a given site at one time, but may later spike to significantly higher levels, because of previously-deposited mercury transported by air, wind and rain to new locations.  Hence, there is no reason to

---

[37]    In that regard, plaintiffs' civil engineer, Kaltofen, testified that regardless of where it is initially deposited, mercury may experience secondary movement as it cycles from soil to air to water, and may be transported by wind, rain and other atmospheric events.  (Tr., at 164-65, 186-89, 194-95.)

[38]    A numerical example will illustrate the point.  Suppose that Parcel X in McIntosh has an observed mercury concentration of 60 ppb in soil.  Secondary effects may be funneling additional mercury to Parcel X by air, rain, and wind (just as they could equally conceivably be removing existing mercury from that site), but plaintiffs have offered no basis for concluding whether and in what time frame the mercury accumulations at Parcel X by secondary movements can reasonably be expected to reach 1 ppb or 1,000 ppb.  Simply put, plaintiffs have failed to show that secondary effects can be expected to make any practical difference in overall observed mercury concentrations at any site in McIntosh on a going forward basis.

believe that any secondary movement of mercury is large enough to matter, in terms of measured mercury concentrations at plaintiffs' properties.

Finally, plaintiffs argue that mercury-contaminated aggregate from the Olin site gives rise to continuing airborne mercury, as vehicular traffic on Allen Barnes Road yields mercury-laced dust that wafts into the surrounding environs. However, there is no evidence as to how far that dust might reasonably be expected to travel or in what concentration.[39] None of plaintiffs LaBauve, Jordan or Lofton own property on or immediately adjacent to Allen Barnes Road, so it is unclear how their property would be affected by activities occurring there. Further, plaintiffs' testing data does not disclose inordinately high mercury concentrations in the immediate vicinity of LaBauve's, Jordan's and Lofton's property. As such, it certainly does not appear that any of them lie directly in the path of a steadily advancing swath of mercury contamination.

Considered collectively, plaintiffs' evidence shows that it is within the realm of conceivable possibility that the property owned by plaintiffs LaBauve, Jordan and Lofton may be subject to future mercury contamination as a result of secondary movement of mercury released by the Olin plant several decades ago. However, plaintiffs have not shown that those plaintiffs' properties are actually injured at this time, or that any future harm to them is imminent or immediate. There is neither evidence nor any particular reason to believe that these properties are aligned in the crosshairs of future mercury contamination. Rather, the property damage of which these plaintiffs complain is exactly the kind of conjectural or hypothetical injury that courts routinely deem insufficient to satisfy the injury-in-fact

---

[39]     Plaintiffs' expert, Dr. Ed Kleppinger, testified that aggregate from Allen Barnes Road emits mercury, "some of which will settle back down near the road and some of which will ... will travel." (Exh. P-17, at 28.) Neither Dr. Kleppinger nor any other witness apparently explains how far such mercury might have traveled from Allen Barnes Road, and in what quantity. As such, it is extraordinarily problematic to ascribe property damage to any plaintiff from the aggregate on Allen Barnes Road, when no plaintiff lives on or adjacent to that road and there is no evidence that mercury from that location could have traveled to and contaminated plaintiffs' property. Absent such an evidentiary link, the relevance of aggregate deposits to plaintiffs' claims is tenuous, at best.

requirement or to confer standing.[40]  The Class A claims of plaintiffs LaBauve, Jordan and Lofton reduce to allegations that their properties <u>might</u> be contaminated with mercury at some time in the future.  But mere apprehension of speculative future injury is simply not sufficient to satisfy the Article III injury-in-fact requirement.  Accordingly, the Court finds that plaintiffs LaBauve, Jordan and Lofton lack standing to bring claims on behalf of the class relating to alleged property damage from Olin mercury contamination.[41]

     *4.  For Rule 23 Purposes, Plaintiff Pressley Has Suffered an Injury in Fact.*

    Plaintiff Daisy Mae Pressley is situated differently from her fellow named plaintiffs with regard to the injury-in-fact requirement.  Testing at Pressley's property disclosed a sample of household dust that registered 170 ppb of mercury, or approximately double the expected background level.  (Tr., at 231.)  At the Rule 23 hearing, plaintiffs' expert Kaltofen testified that toxic effects of mercury contamination, including reproductive consequences, beginning to take hold at the 170 ppb threshold.  (*Id.* at 291; Exh. P-212.)[42]  Plaintiffs have proffered no evidence that a mercury concentration of 170

---

[40]  This "injury" is so elusive that plaintiffs don't even know whether to believe that it exists. The following exchange from plaintiff Jordan's deposition is illustrative:

  "Q:  Do you believe that [your] land itself has been diminished in value because of
      what you talked about, the newspapers and the publicity?
  "A:  I don't know."

(Exh. P-14, at 30.)

[41]  In an effort to prove injury in fact for other class members, plaintiffs suggest that the recent difficulties of putative class members Wendell and Ouida Atchison in selling their property because of the stigma of being located within 3 miles of the Olin factory would somehow be actionable in this litigation.  (Exhs. P-117, P-118.)  For the reasons stated in footnote 96, *infra*, the Court concludes that plaintiffs cannot validly establish an "injury in fact" for Rule 23 purposes in the absence of actual contamination to their properties.  Mere stigma is insufficient because such a theory is inconsistent with how plaintiffs have packaged their claims and, even if it were not, the limitations period for bringing a lawsuit seeking to recover "stigma" damages to property values because of plaintiffs' proximity to a Superfund site undoubtedly expired many years ago.

[42]  Of course, this is a property damage case, not a personal injury case, so Kaltofen's testimony on this point is not particularly illuminating.  In eliciting testimony from Kaltofen as to the

ppb (or twice the background level) on a given property's refrigerator coils, without more, diminishes the value of such property. For that reason, it is debatable whether plaintiff Pressley has sustained an "injury in fact" sufficient to confer upon her standing to bring class claims against Olin for property damage. Nonetheless, the Court finds that Pressley has adequately shown an injury in fact, inasmuch as: (i) a dust sample taken from her residence reveals mercury concentrations well in excess of background levels; and (ii) common sense dictates that a property's value will decline if it is contaminated with pollutants in concentrations that may cause adverse human health effects. For that reason, the Court concludes that Pressley has made a sufficient showing of an actual, real injury to satisfy the "injury-in-fact" element of the standing requirement.[43]

Of course, an injury in fact is not the only requirement for establishing standing. The Court therefore proceeds to address whether Pressley can satisfy the other elements of standing, including specifically the timeliness prerequisite.

      **B.**      ***Timeliness Requirement.***

The law is clear that "[t]o have standing to represent a class, the named plaintiffs' claims must be timely filed." *City of Hialeah, Fla. v. Rojas*, 311 F.3d 1096, 1101 (11th Cir. 2002) (citations omitted); *see also Franze v. Equitable Assurance*, 296 F.3d 1250, 1254 (11th Cir. 2002) (explaining that plaintiff cannot represent class if his claims are time-barred); *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1347 (11th Cir. 2001) ("a class representative whose claim is time-barred cannot assert the claim on behalf of the class"). Accordingly, it is appropriate, and indeed necessary, to consider

---

adverse health effects of mercury concentrations of 170 ppb, plaintiffs' counsel candidly acknowledged, "We're really in a realm [where] we don't belong." (Tr., at 291.) Yet plaintiffs have designated numerous items in the Rule 23 record for the Court's consideration that relate solely to health effects issues.

[43]     In reaching this determination, the Court exercises caution not to commingle merits issues (which are not before it) with jurisdictional, standing issues (which are). In finding that Pressley has satisfied the injury-in-fact requirement, the Court does not specifically hold that the mercury on her property originated from Olin (as opposed to other potential sources) or that her property value has been impaired by the elevated mercury concentration. These questions must await resolution until another day. Instead, the Court's determinations on this point are confined to finding that Pressley has made enough of a showing of injury in fact to withstand scrutiny on that element of standing.

whether a named plaintiff has timely brought her claims in assessing the propriety of class certification. Before assessing whether plaintiff Pressley's claims are timely, however, the Court must first weigh plaintiffs' Motion in Limine to Exclude Evidence Regarding Defense of Statute of Limitation (doc. 163).[44]

     1. *Timeliness Inquiry is Proper and Appropriate at Rule 23 Stage.*

    Plaintiffs' Motion in Limine is animated by the contention that statute of limitations is a merits issue, consideration of which is premature at the class certification stage. (Plaintiffs' Brief (doc. 163), at 1-2.) However, this objection offers no satisfactory rebuttal to the bedrock legal principle in this Circuit that class certification requires a court to consider standing, which does not exist if a plaintiff's claims are untimely. *See Murray v. U.S. Bank Trust Nat'l Ass'n*, 365 F.3d 1284, 1289 n.7 (11th Cir. 2004) (indicating that "any analysis of class certification must begin with the issue of standing"); *Hialeah*, 311 F.3d at 1101 (class action plaintiff lacks standing if his claims were not timely filed). In short, the Court is obligated to make determinations about standing at this time, and cannot do so without considering the timeliness of plaintiffs' claims.

    Notwithstanding this fact, plaintiffs' Motion in Limine advances several other supporting arguments, to-wit: (i) plaintiffs cannot fully and fairly litigate the statute of limitations issue because discovery conducted to date has been confined to class certification issues; (ii) the relevant limitations period should be tolled, and defendants should be estopped from raising the limitations defense, because defendants have concealed facts pertinent to plaintiffs' claims by continuing to deny that the Olin plant has caused significant offsite mercury contamination; and (iii) plaintiffs' claims are timely

---

    [44] Plaintiffs submitted their Motion in Limine on March 30, 2005, one week before the class certification hearing. The following day, the Court conducted a telephone conference relating to that and several other then-pending motions, triggered by the parties' request for expedited ruling. In the wake of that conference, the Court entered an Order (doc. 167) explaining that it would not issue a pre-hearing ruling on plaintiffs' Motion in Limine. That Order advised the parties that "the Court will consider evidence and arguments relating to the statute of limitations issue at the class certification hearing, subject to and without impairing plaintiffs' objections" and that plaintiffs' Motion "will be ruled on in due course following the conclusion of the hearing." (Doc. 167, at 3.) In the event that such Motion were granted, the Order continued, evidence and argument relating to statute of limitations issues would be disallowed. (*Id.*)

under the doctrine of continuous tort because defendants "are continuously every day releasing hazardous pollutants into the environment."  (Plaintiffs' Brief (doc. 163), at 2-9.)

    In the Court's view, none of plaintiffs' identified concerns warrant exclusion of all evidence and argument relating to limitations issues from the class certification calculus.  With respect to the discovery question, review of discovery efforts shows that both sides have taken discovery far exceeding the reasonable parameters of Rule 23 issues.  More importantly, it is unclear why plaintiffs would require discovery from defendants to establish when plaintiff Pressley knew or should have known that Olin had contaminated her property.  The best source of that information would appear to be Pressley herself.  Besides, plaintiffs absolutely could have directed discovery at defendants relating to standing (including the timeliness of the named plaintiffs' claims) because standing is fundamentally a class certification issue.[45]  Likewise, plaintiffs' arguments for equitable tolling/estoppel and continuous torts do not support their Motion in Limine.  Rather than being arguments for excluding the limitations issue from Rule 23 proceedings, these contentions are simply grounds for resolving that issue in plaintiffs' favor.

    For all of the foregoing reasons, the Court is of the opinion that it is not only appropriate, but also necessary, to consider the timeliness of plaintiff Pressley's claims in order to determine whether at least one plaintiff in this action has standing to bring claims on behalf of the class.  *See Franze*, 296 F.3d at 1255 (reversing class certification order where named plaintiffs' claims were untimely, such that they lacked standing to assert claims on behalf of the class).  Plaintiffs' Motion in Limine to Exclude Limitations Evidence (doc. 163) is therefore **denied**, at least insofar as it would preclude the Court

---

[45]    There is no evidence that plaintiffs availed themselves of this opportunity.  Although plaintiffs complain that defendants objected to more than three-quarters of Plaintiffs' First Set of Interrogatories on the grounds that they did not relate to class certification issues, plaintiffs do not allege that any of those interrogatories concerned timeliness or standing issues.  Even if they did, plaintiffs do not assert that they moved to compel responses to those objected-to interrogatories, or that such motions were denied.  Thus, it appears that plaintiffs never posed such interrogatories in the first place because they incorrectly perceived standing/ timeliness as a merits issue.  If plaintiffs failed to obtain standing-related discovery from defendants, they have only themselves to blame.  Such an omission is not grounds for disallowing evidence and argument pertaining to standing at this time.

from determining whether plaintiff Pressley has standing to represent the class.[46]

2.    *Analysis of Timeliness of Plaintiff Pressley's Claims.*

As indicated *supra*, plaintiff Pressley has made a sufficient showing of an injury in fact based on mercury test results from her home. To establish standing to bring her claims in this action, however, she must also show that her claims are timely. Pressley cannot do so.

a.    *Relevant Legal Standards.*

Plaintiffs' Third Amended Complaint purports to assert a host of state-law causes of action. The claims for negligence, absolute liability, strict liability, nuisance, conspiracy, intentional representation, fraud and fraudulent concealment, and equitable and constructive fraud are all subject to a two-year limitations period under Alabama law. *See* Ala. Code § 6-2-38(*l*) (setting catch-all two-year limitations period for non-enumerated claims for injury to person or rights of another); *Saxton v. ACF Industries, Inc.*, 239 F.3d 1209, 1212 (11th Cir. 2001) ("Under Alabama law, the statute of limitations for general tort claims is two years."); *Thompson v. Vaughn*, 592 So.2d 585, 587 (Ala. 1992) (explaining that plaintiffs' negligence and fraud claims were barred by two-year statute of limitations). By contrast, the claims for trespass and punitive damages (construed as a claim for wanton trespass) are subject to a six-year limitations period under Alabama law. *See* Ala. Code § 6-2-34(2) (explaining that "[a]ctions for any trespass to real or personal property" are subject to six-year limitation period); *Motisi v. Alabama Gas Corp.*, 485 So.2d 1157, 1158 (Ala. 1986) ("Trespass actions are barred after six years.").[47]

─────────────────

[46]    Because plaintiffs LaBauve, Jordan and Lofton lack an injury in fact (at least with regard to Class A claims), they do not have standing. The Court need not consider the timeliness of those plaintiffs' claims as part of its standing inquiry, for the simple reason that those plaintiffs would lack standing even if their claims were timely. Likewise, the Court need not grapple with global timeliness issues relating to other class members at this time. Rather, the Court's limitations inquiry is confined to determining the standing of plaintiff Pressley.

[47]    The Court recognizes that Alabama courts draw an arcane, often abstruse distinction between trespass (which is subject to a six-year limitation period) and trespass on the case (which is subject to a two-year limitation period). *See McKenzie v. Killian*, 887 So.2d 861, 866 (Ala. 2004) ("We can say with comfort that the statutory period of limitations for an action in trespass is six years and that the statutory period of limitations for an action in trespass on the case is two years."). The

Having identified the applicable limitations periods, the Court must next determine when those periods began to run in plaintiff Pressley's case. With respect to the fraud claims, Alabama has adopted a discovery rule, such that the two-year limitations period commences "when the plaintiff was privy to facts which would provoke inquiry in the mind of a person of reasonable prudence, and which, if followed up, would have led to the discovery of the fraud." *Auto- Owners Ins. Co. v. Abston*, 822 So.2d 1187, 1195 (Ala. 2001) (citation omitted) (rejecting standard of "actual knowledge" for computing limitations period).

In accordance with the Court's prior rulings in this action, the timeliness of plaintiff Pressley's remaining claims must be assessed by reference to federal law, given the preemptive effect of the federal Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. §§ 9601 *et seq.* ("CERCLA"). In particular, CERCLA provides that:

> "In the case of ***any action brought under State law for personal injury, or property damages***, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, ***such period shall commence at the federally required commencement date in lieu of the date specified in such State statute***."

42 U.S.C. § 9658(a)(1) (emphasis added). The "federally required commencement date" ("FRCD") is defined as "the date the plaintiff knew (***or reasonably should have known***) that the personal injury or property damages ... were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4) (emphasis added); *see also Reichhold Chemicals, Inc. v. Textron, Inc.*, 888 F. Supp. 1116, 1126 (N.D. Fla. 1995) (trigger for FRCD is when plaintiff

---

Court need not parse the minutiae of this distinction, as defendants admit that the six-year term applies to plaintiffs' trespass and wantonness claims here. (*See* Opposition Brief (doc. 138), at 19.) This concession appears prudent, given recent Alabama Supreme Court musings on that topic. *See McKenzie*, 887 So.2d at 870 (explaining that wanton conduct, or the intentional doing of, or failing to do, an act, with likelihood of injury to another's property as a reasonably foreseeable consequence, is actionable in trespass and governed by the six-year limitations period). As such, the Court will apply the six-year limitations period to this claim.

became aware of contamination, and it is not necessary that plaintiff know identity of specific pollutant(s) involved).

Thus, the critical legal inquiry for purposes of establishing when the limitations period began to run for plaintiff Pressley is when she "reasonably should have known" that her property had been damaged by industrial contamination from the Olin site. Defendants have developed considerable evidence on this point.

b.    *Equitable Estoppel.*

As an initial matter, plaintiffs argue that equitable considerations prevent this Court from ever reaching the question of whether plaintiff Pressley's claims are timely. As the Court understands it, plaintiffs maintain that defendants are equitably estopped from invoking the "disingenuous" statute of limitations defense because of their persistent denials (both in public and in this litigation) that plaintiffs' claims have merit or that Olin contamination has spread offsite. (*See* Plaintiffs' Brief, at 23 n.15, 44, 50 n.32; Reply Brief, at 16-21.) Plaintiffs express indignation that defendants "still state that contamination beyond the plant boundaries does not exist," and suggest that if defendants are denying liability even to this day, then plaintiffs could not possibly have known anything about their claims until plaintiffs' counsel completed their initial testing on February 2, 2004. (*See* Plaintiffs' Brief, at 23 n.15, 50 n.32; Reply Brief, at 15-16.) In support of their argument, plaintiffs rely heavily on several depositions which Olin representatives denied that the plant had contaminated the community. (Reply Brief, at 18.) (Excerpts of several of these depositions were presented in video form via a DVD as Exhibit B to plaintiffs' post-hearing submissions.) For example, in a Rule 30(b)(6) deposition, Olin representative Toni Odom testified that she did not believe there was any hazardous waste offsite and that she was unaware of any reason why McIntosh residents should be concerned about health effects or property contamination from the Olin site. (Exh. P-24, at 27, 30-35, 376-78.) Similarly, Olin's former plant manager, Joseph Rytlewski, testified in his deposition that he did not know of any offsite contamination or any reason for community residents to fear adverse health effects or property value diminution from Olin activities. (Exh. P-28, at 78-81.)

Both common sense and applicable law confirm that these circumstances fall well short of

-31-

supporting a viable equitable estoppel argument.  Essentially, plaintiffs maintain that defendants should be barred from invoking the statute of limitations because they have denied and continue to deny liability.  If this were the test for equitable estoppel, then few plaintiffs would *ever* be subject to meaningful limitations constraints, as it is the rare defendant who does not deny wrongdoing prior to and during class action litigation, especially where millions of dollars may be at stake.  In any event, plaintiffs fail to identify a single authority in which a defendant's mere denial of liability prior to and during litigation is a valid basis for applying equitable estoppel.[48]  Examination of case law interpreting and applying equitable estoppel, both at the federal level and under Alabama law, establishes that much more than a mere denial of liability is needed.  *See Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 932 (6th Cir. 2004) ("To toll the limitations period because a prospective defendant denies its liability ... would circumvent the purpose of the statute of limitations."); *Page v. Hale*, 472 So.2d 634, 636 (Ala. 1985) ("In general, conduct which is sufficient to give rise to an estoppel against the pleading of a statute of limitations must amount to an affirmative inducement to the plaintiff to delay bringing the action.").[49]  Indeed, in a case arising under federal law, the Eleventh Circuit explained that, "[t]o successfully invoke the doctrine, the late arriving plaintiff must show that she was misled by defendant or its agents so that [s]he delayed suit because of (a) an affirmative statement that the statutory period to bring the action was longer than it actually was, or (b) promises to make a better

---

[48]    Plaintiffs articulated their equitable estoppel argument in the span of more than five pages in the context of a 71-page reply brief, and in another five pages in their brief in support of their Motion in Limine, yet their only citation of authority in either document on that point was a generic quotation from *Black's Law Dictionary*.

[49]    *See also Jim Walter Homes, Inc. v. Nicholas*, 843 So.2d 133, 136 (Ala. 2002) (explaining that plaintiff may overcome limitations defense by "estoppel by reason of unfulfilled promises of the defendant in exchange for the plaintiff's agreement to postpone commencement of an action"); *Jim Walter Homes, Inc. v. Kendrick*, 810 So.2d 645, 651 (Ala. 2001) (equitable estoppel did not prevent limitations defense where record did not show that defendant made promises to plaintiff on condition that plaintiff not file suit); *McCormack v. AmSouth Bank, N.A.*, 759 So.2d 538, 543 (Ala. 1999) (equitable estoppel is applied to defeat limitations defense where defendant represented to plaintiff that he would remedy problem, and plaintiff was induced by such representations to delay filing suit).

settlement of the claim if plaintiff did not bring suit or (c) comparable representations and conduct."
*Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1323-24 (11th Cir. 1989). No such allegations
have surfaced here. As such, the Court rejects plaintiffs' attempt to sidestep the limitations issue
altogether via equitable estoppel predicated on a theory that defendants have consistently denied
wrongdoing.

c.    *Continuous Tort.*

In the alternative, plaintiffs insist that the statute of limitations defense has no valid application
here because "all of Defendants' activities are continuous and Plaintiffs' claims should fall under the
ambit of the continuous tort doctrine." (Reply Brief, at 16.) Curiously, despite their voluminous briefing
regarding the limitations issue (spanning dozens of pages in the aggregate), neither side devotes more
than passing attention to whether plaintiffs' claims may be rendered timely under a continuous tort
theory. Plaintiffs' argument on this point is confined to a conclusory statement "that Defendants are
continuously every day releasing hazardous pollutants into the environment and surrounding community,
continuously defrauding the community, and continuously conspiring to manipulate data to present to
government agencies." (*Id.* at 16.) No authorities are offered to describe or apply the continuous tort
doctrine. No evidence is presented to support these accusations of ongoing releases of mercury by
Olin today (aside from the NPDES permit). Apparently, plaintiffs invoke continuous tort doctrine as an
afterthought. Although the cursory manner in which it was raised would justify summary rejection of the
continuous tort claim, the Court will consider it on the merits.

"When a tort is deemed continuous, the limitations period runs from the last date the plaintiff
was exposed to damages." *Haynie v. Howmedica Osteonics Corp.*, 137 F. Supp.2d 1292, 1294
(S.D. Ala. 2000). In *Moon v. Harco Drugs, Inc.*, 435 So.2d 218 (Ala. 1983), the Alabama Supreme
Court explained that a continuous tort occurs when a defendant engages in "repeated tortious conduct
which has repeatedly and continuously injured a plaintiff." *Id.* at 220. Where a continuous tort exists,
the result is analogous to continuing trespass, such that "the repeated actions of the defendants
combined to create a single cause of action in tort." *Id.* at 221. The ultimate effect of a continuous tort
is to extend the statute of limitations by compressing a protracted course of conduct into a single cause

-33-

of action.  *Id.*; *see also Reichert v. City of Mobile*, 776 So.2d 761, 766 (Ala. 2000) (continuous torts toll the running of the statutory limitations period).  However, Alabama courts have clarified that the "continuous tort" doctrine is not available in instances where a single act is followed by multiple consequences, but rather requires "repetitive acts or ongoing wrongdoing."  *Payton v. Monsanto Co.*, 801 So.2d 829, 835 & n.2 (Ala. 2001).

To the extent that the continuing wrongdoing claimed by plaintiffs consists of either secondary migration of Olin pollutants in the community or defendants' failure to take appropriate offsite remedial measures to correct existing contamination, such allegations do not support application of the continuous tort doctrine.  Indeed, a defendant's failure to clean up contamination that predates the limitations period, or the migration of such "old" contamination from one location to another, does not constitute a continuous tort, as a matter of law.  *See Milford*, 390 F.3d at 933 (further migration of pollutants released before the statutory period, without further acts by the defendant, does not constitute an additional tort or a continuing trespass); *Achee v. Port Drum Co.*, 197 F. Supp.2d 723, 735-36 (E.D. Tex. 2002) (continuous tort doctrine was inapplicable because alleged tortious conduct ceased when plant was closed and, although plaintiffs claimed continuing wrong because defendant failed to clean up area, the refusal to modify or reverse prior wrongful conduct is not a continuing tort).

Plaintiffs maintain that the continuing wrongful activity consists of ongoing release of hazardous pollutants from the Olin site into the community, as well as ongoing fraudulent activities by Olin towards the community and regulators.  However, there has been no evidence that defendants are presently releasing appreciable quantities of mercury or other hazardous substances offsite in a manner that might contaminate plaintiff Pressley's property.[50]  As for plaintiffs' allegations of ongoing fraud, viewed in the

---

[50]    The Court understands that plaintiffs have not yet had an opportunity to conduct full merits discovery, and that they therefore may lack comprehensive, current information as to the nature of Olin's present activities.  However, discovery performed to date reflects that the mercury chlor-alkali plant at the heart of plaintiffs' claims herein was not used after 1982, and was shut down completely a short time later. (Tr., at 17.)  Such discovery also confirms that Olin has not used mercury in its production process since 1982. (*Id.* at 40.)  Plaintiffs apparently do not dispute either of these points.  The Rule 23 hearing made plain that this litigation is and always has been about mercury wastes released by Olin between 1952 and 1982.  In the Court's view, even at the Rule 23 stage, the

-34-

light most favorable to plaintiffs, the evidence shows that defendants have misrepresented the nature and extent of contamination to the community and to the news media, up through and including the present day.[51]  Be that as it may, however, any such continuing fraudulent activities would not present plaintiff Pressley with a viable continuous tort argument because (as will be discussed below) she became aware of defendants' alleged wrongdoing many years ago.  At least with respect to Pressley, there can be no continuing fraud because she necessarily stopped believing and relying on defendants' representations when she took an outspoken stand that Olin had contaminated her property.  Thus, with respect to plaintiff Pressley, allegations of continuing tort through ongoing fraudulent conduct cannot succeed.  The alleged fraud was complete as to Pressley when she stopped relying on defendants' representations and reassurances.  That date may be ascertained through examination of Pressley's own conduct and testimony, and any fraudulent activities by defendants thereafter cannot bolster Pressley's fraud claims because she could not reasonably have relied on defendants' representations.

In short, Pressley may not evade the limitations defense by relying on the continuous tort

_____

continuous tort doctrine may not properly be invoked through an unvarnished, conclusory statement of continuing pollution where all of the record evidence reveals that defendants' mercury contamination activities of concern halted long ago.  To be sure, plaintiffs maintain that offsite disposal of mercury-laden aggregate occurred as recently as several years ago.  However, those disposal activities are too remote in time and type from the earlier contamination to constitute a continuous course of tortious activity.  Besides, there is no indication that Pressley has any aggregate on or near her property or that any aggregate in McIntosh has affected her property.  To the contrary, the aggregate was deposited in certain discrete locations around McIntosh, and there has been no evidentiary showing that dust from that aggregate has or may have traveled to and settled on her property.

[51]    For example, in a letter to the editor published in the *Mobile Register* on March 15, 2005, Olin's plant manager Steve Asbill indicated that mercury in aggregate from Olin "is chemically 'bound up' in the material and cannot naturally leach into the environment" and that all dirt donated by Olin was "tested and verified to be safe before it was moved."  (Exh. P-124.)  Viewed in the light most favorable to plaintiffs, and based on the incomplete factual record generated to date, such representations arguably support plaintiffs' contention that they were made pursuant to a continuing course of fraudulent concealment.

doctrine.[52]  The applicable limitations periods must be applied to Pressley's claims to ascertain whether she has standing, with the critical issue being when she knew or should have known of the injury of which she now complains.

### d.    Facts Relating to Plaintiff Pressley's Knowledge.

In or about the mid 1990s, Pressley became the secretary of the Environmental Justice Task Force (the "Task Force" or the "Southern Organizing Committee"), which she described as a community group that conducted meetings because of concerns about pollution by Olin and Ciba in their community, including the area south of Olin where Pressley resides.  (Exhibit D-331, at 60-62.) Pressley began attending Task Force meetings at least as early as 1996 or 1997.  (*Id.* at 105-06.)  This Task Force discussed concerns regarding pollution in the area, and met with representatives of Olin and Ciba in an effort to redress those grievances.  (*Id.* at 67.)  The Task Force printed up its own letterhead bearing the legend "Southern Organizing Committee For Economic and Social Justice, McIntosh Chapter," and plainly identifying Pressley as the group's secretary in the upper right hand corner, along with the organization's other officers.  (Exhibit D-337.)  Pressley was one of several "main individuals" at the Task Force during the 1998 time frame.  (Exh. D-331, at 79.)

In November 1998, the Task Force sent a memorandum to Olin and Ciba on its letterhead

---

[52]        Two points bear amplification.  First, the Court's rejection of the continuous tort doctrine is confined to plaintiff Pressley, because it is her standing (and not the timeliness of plaintiffs' claims generally) that is at issue.  Nothing herein would prevent other class members from invoking continuous tort theory to overcome the limitations defense, depending on their individual circumstances. Second, there is a simple, common-sense rationale why Pressley is not entitled to invoke continuous tort doctrine.  The harm of which she complains in this lawsuit is twofold: (i) alleged diminution in her property value caused by mercury contamination; and (ii) alleged deception by defendants preventing her from taking remedial measures, moving away, or exerting pressure on defendants to clean up the damage.  There is no evidence and no reason to believe that Pressley's property has been subject to any continuing mercury contamination from Olin.  Olin has not used mercury in its production process for more than 20 years, and there is no evidence that Pressley lives at or in immediate proximity to areas where "donated" aggregate from Olin has been spread.  Thus, any mercury on Pressley's property that originated from Olin must have been released many years ago, and cannot be a continuous tort.  And any harm to Pressley from deceptive activities by defendants was not continuing in nature, but rather came to an end as soon as she knew or had reason not to rely on defendants' representations, as discussed *infra*.

stating, in relevant part, as follows:

> "The McIntosh Community and Chemical Company employees request the relocation of McIntosh High School and approximately 300 families located in the contaminated areas. The suggested location should be at least 5 miles from plant site."

(Exhibit D-337.) The letter went on to request compensation for plant workers who had been injured by exposure to chemicals, as well as for "any community member, who has been in contact, whether direct or indirect, and has suffered from leaks or air contamination." (*Id.*) The requested area of relocation included properties south of the Olin facility and encompassed Pressley's home, where she has lived for the last 40 years. (Exhibit D-331, at 23-24, 76.) At the time that letter was sent, Pressley "believed" that Olin operations had contaminated the areas from which relocation was requested, including her home. (*Id.* at 76-77.)[53] Pressley testified that she was affiliated with the organization in 1998 because of these beliefs, stating that "[i]f I didn't believe it, I wouldn't have been with the organization." (*Id.* at 92.)

Within weeks after the November 1998 letter, the Task Force held a meeting with Olin's then-plant manager, Mr. Rytlewski, at the Olin guest house. (*Id.* at 78-81.) Pressley attended this meeting. (*Id.* at 78.) Pressley recalls that during the meeting, the Task Force's president, George Curtis, reiterated the community's requests for relocation of 300 families and McIntosh High School, and for compensation for community members who had been in contact with pollutants through leaks and air contamination. (*Id.* at 81-82.) Pressley's recollection is that when Olin's representative denied the contamination and indicated that nothing was wrong, Curtis responded that, "if you aren't going to consider what we are saying, we'll just leave," after which the Task Force representatives (including Pressley) did just that. (*Id.* at 84.)

Following the November 1998 meeting with Olin, the Southern Organizing Committee

---

[53]    To be sure, there is no evidence that Olin openly admitted offsite contamination to Pressley or anyone else during the time frame of the November 1998 Task Force memorandum. To the contrary, Pressley testified that as of 1998, Olin "kept telling us everything was fine, wasn't nothing wrong, no contamination. Everything was roses." (Exh. D-331, at 77.) According to Pressley, Olin representatives told the Task Force that all the pollution "was on site" and "wasn't off from the plant." (*Id.*)

conducted a community meeting in early December, which was attended by more than 100 people. (*Id.* at 86-87.)  The next week, Pressley and other community members attended a multi-day training workshop in Baton Rouge, Louisiana, for the purpose of receiving training about the community's rights and what steps could be taken "about doing something that was a concern for the people."  (*Id.* at 88.)[54]

Pressley's deposition depicts in stark, unambiguous terms that the battle lines had been drawn between Olin and the Task Force by no later than 1998, and that she had actively represented the citizens of McIntosh in shaping the community's emergent dispute with Olin.

    e.    *Relevant FRCD for Pressley.*

The obvious question for assessing the timeliness of plaintiff Pressley's claims is when the limitations period commenced.[55]  That issue turns on her FRCD, or when she knew or reasonably

---

[54]    Other record testimony reflects that in October 1998, Curtis and a delegation of representatives of the Task Force met with an attorney regarding potential legal action against Ciba and Olin.  (Curtis Dep. at 137-40, 145.)  Pressley was among the community members who attended that October 1998 lawyer meeting.  (*Id.* at 140.)

[55]    Plaintiffs argue that the Court should not determine the FRCD for Pressley because that question is for the jury to decide.  The Court disagrees.  To be sure, there is ample authority for the proposition that timeliness is generally a jury question.  *See, e.g., O'Connor*, 311 F.3d at 1150 (recognizing "fact-intensive nature" of determination of when plaintiff was on notice of claim); *Union Pacific R. Co. v. Reilly Industries, Inc.*, 215 F.3d 830, 841 (8th Cir. 2000) (opining that jury must make advisory finding as to when plaintiffs knew or should have known of property damage).  That said, both federal and Alabama authorities show that the question of when a plaintiff should have known of injury may be decided as a matter of law under certain circumstances.  *See O'Connor*, 311 F.3d at 1150 (judicial finding of untimeliness is appropriate if record leads inexorably to a single inference that plaintiffs knew or suspected the cause of their injuries more than one year before filing their claims); *Jim Walter Homes, Inc. v. Kendrick*, 810 So.2d 645, 650 (Ala. 2001) (question of when plaintiff should have discovered fraud may be decided as a matter of law if plaintiff's knowledge would have placed a reasonable person on notice of fraud); *Franze*, 296 F.3d at 1254 (determining, as a matter of law, when plaintiffs were placed on inquiry notice, and reversing district judge's determination that they were not on such inquiry notice more than one year before they filed suit); *Whitlock v. Jackson Nat. Life Ins. Co.*, 32 F. Supp.2d 1286, 1290 (M.D. Ala. 1998) (citing Alabama caselaw explaining that application of the discovery rule in the context of the statute of limitations may be decided as a matter of law, in certain circumstances).  In this case, the Court must make a determination on the class certification issue, which in turn depends on the named plaintiffs' standing, which in turn depends on the

should have known that her property had been damaged by mercury contamination. *See* 42 U.S.C. § 9658(b)(4). As reflected by the statutory language, the "reasonably should have known" requirement is an "objective standard for accrual" based not on what a plaintiff actually knew, but what she reasonably should have known. *See Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 198 (2$^d$ Cir. 2002) (FRCD applies "if there was sufficient information that a plaintiff reasonably should have known the cause of the injury earlier than he actually knew"). This standard requires less than actual knowledge, but more than "mere suspicion, whatever its reasonableness." *Id.* at 205-06; *see also O'Connor v. Boeing North American, Inc.*, 311 F.3d 1139, 1148 (9th Cir. 2002) ("the federal standard requires more than suspicion alone").

In applying the FRCD's "reasonably should have known" standard, courts apply a two-pronged test. First, they assess "whether a reasonable person in Plaintiffs' situation would have been expected to inquire about the cause of his or her injury." *O'Connor*, 311 F.3d at 1150. If the plaintiff was on inquiry notice, then courts consider whether such inquiry "would have disclosed the nature and cause of plaintiff's injury so as to put him on notice of his claim," and charge plaintiff with knowledge of facts that would have been discovered through that process. *Id.* The law is clear that the "reasonably should have known" test under FRCD "does not permit a party to await certainty." *Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 932 (6th Cir. 2004) (when plaintiff knew that defendant had released chemicals and that chemicals were present in plaintiff's water supply, it knew or should have known of its cause of action). A key point in applying the FRCD rule is that a plaintiff "must be diligent in discovering the critical facts. As a result, a plaintiff who did not actually know that his rights were violated will be barred from bringing his claim after the running of the statute of limitations, if he should have known in the exercise of due diligence." *Bibeau v. Pacific Northwest Research Foundation*

---

timeliness of their claims. No standing determination can be made without a ruling on timeliness, so the issue as presented cannot simply be blindly deferred to a jury without some preliminary judicial determination. Besides, the evidence supports a singular inference that Pressley was on inquiry notice of the alleged contamination by no later than November 16, 1998, the date of the Task Force's demand letter; therefore, the Court finds it appropriate to resolve the timeliness question (at least as it relates to plaintiff Pressley's standing) as a matter of law.

*Inc.*, 188 F.3d 1105, 1108 (9th Cir. 1999).

Plaintiffs claim that the appropriate FRCD is February 2, 2004, the date their counsel received test results relating to the McIntosh area. (Reply Brief, at 15.) The Court has previously expressed incredulity toward the legitimacy of that date, which underlines postdates the filing of plaintiffs' Complaint by six months. In neither their filings nor the class certification hearing have plaintiffs done anything to alleviate that skepticism. For plaintiffs to assert that, as a matter of law, they neither knew nor reasonably should have known the factual bases for their claims until six months after they filed a detailed 30-page, 12-count lawsuit is absurd. Although they have been afforded several opportunities to justify their reasoning, plaintiffs have identified no authority in support of the proposition that a FRCD for specific wrongdoing delineated in a complaint may not occur until many months after the filing of that complaint. Clearly, then, the February 2, 2004 date is of no legal significance in computing plaintiff Pressley's FRCD, as she manifestly had or should have had knowledge of her injuries and of defendants' alleged wrongdoing on August 25, 2003, the date when she sued Olin.

To determine the appropriate FRCD for Pressley, the Court looks to facts specific to her. Evidence adduced during class discovery revealed that Pressley began attending community meetings regarding Olin/Ciba environmental contamination in 1996 or 1997. By the fall of 1998, Pressley had become secretary for the Southern Organizing Committee, and actively participated in that organization's negotiations with Olin. Specifically, Pressley's name appears with a short list of other Task Force officers on the letterhead of a memorandum dated November 16, 1998, in which the Southern Organizing Committee demanded that Olin relocate 300 families (including Pressley's) "located in the contaminated areas," as well as the high school, at least five miles away from the plant because of alleged offsite contamination. That same memorandum requested compensation for community members who might have been exposed to such contamination.[56] The record further shows that in October 1998, Pressley actively participated in efforts to secure legal counsel for the community with regard to Olin/Ciba contamination. Within weeks after the Task Force sent the November 1998 letter, Pressley attended a meeting at which Olin denied wrongdoing, prompting Pressley and other

---

[56]     Olin rebuffed the demands of Pressley's organization. (Exh. P-27, at 124-27.)

members of her organization to walk out because they felt their demands were not being seriously considered.  Pressley then attended a multi-day, out-of-town training seminar regarding steps that could be taken to protect the community's rights.

In light of this evidence, the Court fixes the FRCD for plaintiff Pressley at November 16, 1998, the date on which she and other members of the community demanded in writing that Ciba and Olin relocate their families from "contaminated areas" to a location at least five miles away.[57]  This evidence unequivocally establishes that on that date, Pressley believed that her property was contaminated, believed that the contamination was sufficiently serious to require relocation, and believed that Ciba and Olin were responsible, and that these beliefs were sufficiently solidified by that time that she initiated concerted action against Olin on the community's behalf.  Equally importantly, the record shows that by November 1998, plaintiff utterly dismissed Olin's representations that the community was safe, to the point that she and other members of her organization walked out of a meeting when Olin's plant manager made such statements.[58]  At this time, Pressley was actively seeking legal counsel and attending training seminars to explore available options.  Plainly, then, by November 1998, Pressley was squarely on inquiry notice that her property was contaminated and that Olin was the culprit.[59]

_____

[57]     To be clear, this FRCD is restricted to Pressley.  The Court expresses no opinion at this time as to the appropriate FRCD for any other plaintiff or class member.

[58]     This testimony belies Pressley's contention that even though she believed her property was contaminated, she was not on notice of any problems because "they kept telling us, you know, wasn't nothing wrong."  (Exh. P-27, at 77.)  Pressley therefore cannot deflect her admitted belief of contamination by reference to assurances from Olin, when her own testimony makes clear that by November 1998 she and other members of the community had thoroughly discounted such representations, made demands that they be relocated because of contamination to their property, and boycotted meetings in which Olin voiced such rhetoric.

[59]     In opposition to this reasoning, plaintiffs embark on a game of semantics by arguing that Pressley's "belief" does not equate to "knowledge," because she was merely a "concerned citizen[] listening to large, powerful corporations repeatedly deny the presence of offsite contamination."  (Reply Brief, at 23.)  This contention ignores the fact that Pressley, by her own testimony, stopped listening to those "large, powerful corporations" as of November 1998 and began taking action in furtherance of her avowed convictions that her property was contaminated.  Plaintiffs' reasoning would innoculate Pressley from the preclusive effects of the limitation period until she gained actual knowledge of

Therefore, she is charged, as of November 1998, with whatever knowledge a reasonable inquiry might bring, including specifically the knowledge of offsite mercury contamination in and around her property. That Pressley opted not to engage in such an inquiry until her lawyers conducted testing on her behalf in early 2004 does not excuse her from being charged much earlier with the knowledge that such inquiry would reasonably have obtained, had it been done in a reasonably prompt manner.[60]

Defendants argue that the FRCD for Pressley should date back to at least 1995 because by that time it was public knowledge that the Olin site was a Superfund property, various McIntosh community organizations had begun holding town meetings about contamination issues, the EPA was holding meetings, and there was newspaper coverage of alleged contamination. (Opposition Brief, at 19-20.) But Pressley testified that she did not begin attending Task Force meetings until 1996 or 1997. There is no evidence that her involvement in that organization became elevated until 1998, or that she ever disbelieved Olin's representations of non-contamination before late 1998. Indeed, defendants fail to provide any evidence that Pressley even believed that her property was contaminated as of 1995, as

---

contamination on her property. However desirable that approach may be from plaintiffs' standpoint, it is unquestionably not the proper legal standard, and will not be embraced here. Accordingly, plaintiffs' reliance on Pressley's deposition testimony that she lacked "solid information" proving offsite contamination until February 2004 is misplaced and unavailing. (Reply Brief, at 35-36.) To hold otherwise would be to allow plaintiffs to manipulate the running of the limitations period by averting their eyes to wrongdoing for years or decades, delaying tests to confirm what they already believe and have reason to believe is true, and then saying they could not have sued earlier because they lacked "solid information." The practical ramifications of that scenario are that statutes of limitations would be rendered meaningless.

[60]      Because the accrual standard under federal and state discovery rules turns on what a plaintiff reasonably should have known, the Court need not separately consider plaintiffs' argument that the limitations period should be equitably tolled because of defendants' fraudulent concealment. *See Jim Walter Homes, Inc. v. Nicholas*, 843 So.2d 133, 136 (Ala. 2002) ("plaintiff can overcome a defense of limitations by averment and proof of circumstances permitting tolling of the running of the limitations period, such as fraud on the part of the defendant in concealing the wrongdoing"); *Payton v. Monsanto Co.*, 801 So.2d 829, 834 (Ala. 2001) (same) These issues are two sides of the same coin where, as here, plaintiffs argue that they could not reasonably have known about the alleged injury earlier because of the fraudulent concealment. Under either an equitable tolling analysis or a discovery rule analysis, the result is the same: Pressley's limitations period commences when she reasonably was on notice of the injury and its cause. That date was November 1998.

her deposition testimony addressed her beliefs as of November 1998.[61]  With respect to media accounts of contamination, the unrebutted testimony is that Pressley does not read the *Washington County News* with any frequency.  (Exh. P-27, at 85.)[62]  Accordingly, defendants have failed to produce any evidence that might justify an FRCD for Pressley dating back to 1995.

> f.     *Plaintiff Pressley's Trespass and Wantonness Claims are Timely.*

On the heels of that labyrinthine timeliness analysis, spawned by dozens of pages of briefing by both sides, the anticlimactic conclusion is that certain of plaintiff Pressley's claims are timely, while others are not.  All of her causes of action that are subject to a two-year limitations period (including state-law claims for negligence, absolute liability, strict liability, nuisance, conspiracy, intentional representation, fraud and fraudulent concealment, and equitable and constructive fraud) are time-barred.  As both federal and state discovery rules were triggered by November 16, 1998, Pressley was obliged to file suit on these claims by no later than November 16, 2000; however, she tarried for more than two and a half years after that deadline.  As such, these claims are plainly untimely, and Pressley lacks standing to pursue them on behalf of a class.

A different result inures to Pressley's claims of trespass and wantonness / punitive damages.  As indicated *supra*, those claims are subject to a six-year limitations period, such that Pressley was obligated to file suit on those theories by no later than November 16, 2004.  The Complaint satisfies this filing deadline with more than a year to spare; therefore, the Court finds that Pressley does have standing (both from a timeliness standpoint and an injury-in-fact standpoint) to prosecute state-law

---

[61]     Indeed, defense counsel's questions in Pressley's deposition were narrowly focused and specifically directed at what she believed in November 1998.  (Exh. P-27, at 76-77.)  It does not appear that defendants elicited any testimony as to what she may have believed at some earlier time; therefore, they have deprived themselves of the factual predicate for this argument.

[62]     In any event, the only news articles about which defense counsel interrogated Pressley date back to late 1998.  (Exh. P-27, at 85-92.)  There is thus no evidence that Pressley read any publicity about contamination in McIntosh prior to late 1998.  Even if there were such evidence, at least one court has cautioned against making limitations determinations, as a matter of law, based on news clippings.  *See O'Connor*, 311 F.3d at 1152-53 (finding that district court erred in concluding as a matter of law that news reports of defendants' conduct were sufficiently numerous and notorious to impute knowledge of them to plaintiffs).

claims of trespass and wanton trespass on behalf of a class of similarly-situated plaintiffs.[63]

## IV.    Class Definition of Class A.

### A.    *Legal Standard for Definability of Class.*

Although not an express Rule 23 requirement, it is imperative that Class A (and its various subclasses) be definable in a reasonable manner. "In order for a party to represent a class, 'the class sought to be represented must be adequately defined and clearly ascertainable.'" *Adair v. Johnston*, 221 F.R.D. 573, 577 (M.D. Ala. 2004) (quoting *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970)); *see also Gustafson v. Polk County, Wis.* 226 F.R.D. 601, 607 (W.D. Wis. 2005) (implied requirement for class certification is that definition of proposed class must be precise, objective and presently ascertainable); *Mike v. Safeco Ins. Co. of America*, 223 F.R.D. 50, 52-53 (D. Conn. 2004) (class certification improper unless class is sufficiently definite to render it administratively feasible for court to determine membership of particular individuals without mini-hearings).[64]

In determining whether a class is adequately defined, courts consider whether the proposed definition "specif[ies] a particular group that was harmed during a particular time frame, in a particular location, in a particular way" and "facilitat[es] a court's ability to ascertain its membership in some

_____

[63]    Given the parties' exhaustive discussion of limitations issues, it is surprising that they largely overlooked the significance of the six-year limitations period for trespass and wantonness claims. Indeed, plaintiffs scarcely mentioned it, while defendants focused both their discovery efforts and their arguments in the Rule 23 hearing on demonstrating Pressley's knowledge and beliefs relating to contamination in and after late 1998, a questionable strategy given that a 1998 discovery date would place Pressley's trespass and wantonness claims well within applicable limitations periods under Alabama law.

[64]    It is appropriate to consider the class definition issue antecedent to detailed scrutiny and application of the Rule 23 elements. *See Bentley v. Honeywell Intern., Inc.*, 223 F.R.D. 471, 477 (S.D. Ohio 2004) ("Before delving into the "rigorous analysis" required by Rule 23, a court first should consider whether a precisely defined class exists and whether the named plaintiffs are members of the proposed class."); *Robinson v. Gillespie*, 219 F.R.D. 179, 183 (D. Kan. 2003) ("In determining whether to certify a class, the court begins with the proposed definition of the class" because absent a cognizable class, the Rule 23 requirements are irrelevant); *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 163 (C.D. Cal. 2002) (indicating that Rule 23 factors are not considered until after ascertainable and identifiable class has been defined).

objective manner." *Bentley v. Honeywell Intern., Inc.*, 223 F.R.D. 471, 477 (S.D. Ohio 2004).
Courts have declined to certify a class where the proposed definition would not enable identification of
class members short of individualized fact-finding. *See Crosby v. Social Sec. Admin. of U.S.*, 796
F.2d 576, 580 (1st Cir. 1986); *Noble v. 93 University Place Corp.*, 224 F.R.D. 330, 338 (S.D.N.Y.
2004) (class definition is rejected if mini-hearing on merits of each plaintiff's case will be necessary to
ascertain their class membership). Simply put, "[a] court should deny class certification where the class
definitions are overly broad, amorphous, and vague, or where the number of individualized
determinations required to determine class membership becomes too administratively difficult." *Perez
v. Metabolife Intern., Inc.*, 218 F.R.D. 262, 269 (S.D. Fla. 2003). Where, as here, plaintiffs
subdivide a class into multiple subclasses, each subclass must separately satisfy class certification
requirements, including the definability prerequisite. *See Morris v. Wachovia Securities, Inc.*, 223
F.R.D. 284, 291 (E.D. Va. 2004) ("The class action requirements must also be separately proven as to
any proposed subclass."); *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 696 (S.D. Fla. 2004)
("Each proposed subclass must independently satisfy class action criteria.").

      **B.**     ***Application to Class A and Associated Subclasses.***

      As mentioned *supra*, Class A is a Property Class that would be divided into subclasses defined
by the pathway of pollution. Hence, plaintiffs would have the Court certify an air subclass, a surface
water subclass, and a groundwater subclass, each of which would be comprised of persons whose
property was exposed to contamination by Olin through the specified environmental pathway. Of the
three subclasses, only the air subclass is defined through objective criteria. Plaintiffs have utilized an air
dispersion model to identify a "zone of contamination" extending approximately 20-25 kilometers
around the Olin plant, representing the geographic area in which significant airborne mercury
contamination could reasonably be expected to have been deposited by Olin's operations from 1957 to
1971. There can be no reasonable dispute that the Class A air subclass is readily defined through the
singular criterion of property ownership within the isopleth charted by Dr. Sajo. Clearly, then, the air

subclass has been adequately defined and is readily ascertainable.[65]

The surface water and groundwater subclasses rest on a vastly different definitional footing than the air subclass. Plaintiffs characterize the former as encompassing "nearby properties" contaminated by surface water runoff from the Olin facility, including "owners of property south of the plant and those owning property along and near Bilbo Island and Bilbo Creek." (Plaintiffs' Brief, at 6-7.) However, plaintiffs proffer no objective means of designating a property as "nearby" these landmarks for purposes of defining the surface water subclass, much less for determining whether such "nearby properties" have in fact been contaminated by surface water runoff from Olin. Plaintiffs do not draw the boundaries of the surface water subclass on a map, whether using isopleths or identifying particular corridors of surface water runoff. Indeed, short of engaging in exhaustive property-by-property testing procedures for Olin surface water runoff and contamination, plaintiffs do not offer (and the Court does not perceive) any method for determining whether a particular property owner lies within the scope of the surface water subclass.[66] It would thus be inordinately difficult, from an administrative standpoint, for

---

[65]    Defendants argue that the air subclass lacks definability because it has no temporal dimension. (Opposition Brief, at 23.) That objection is unfounded, however, inasmuch as plaintiffs have narrowly restricted Class A to property owners "as of the date of certification of the class in this matter." (Plaintiffs' Brief, at 4.) Contrary to defendants' suggestion, then, it will be unnecessary to slog through property ownership records for a half century or more to determine the identities of air subclass members; rather, membership is constrained to those persons owning property within the zone of contamination as of the date of class certification.

[66]    Plaintiffs attempt to mollify the Court and minimize these concerns by indicating in bold type that "[t]he area of the surface water subclass is subsumed within the boundaries of the air subclass." (Plaintiffs' Brief, at 7.) But this purported "limitation" is cold comfort, as it is grossly overreaching to the point of being useless. Plaintiffs' expert, Robert Simons, admitted as much by opining in his report that "[t]his impacted area from aerial deposition is substantially larger than the area affected by surface water contamination." (Exh. P-28, at 7.) On the evidence before the Court, it would be preposterous to claim (and plaintiffs do not claim) that all, or even most, property owners 20-25 kilometers away from Olin have been subjected to mercury contamination resulting from surface water runoff at the plant. Clearly, to the extent that it is definable at all, the surface water subclass can occupy no more than a small subset of the hundreds of square kilometers encompassed by the air subclass. For these reasons, the Court cannot cast aside the serious definitional problems presented here by certifying a surface water subclass coextensive with the geographic area of the air subclass, and trusting plaintiffs to whittle that patently overbroad scope to more reasonable dimensions through some

-46-

the Court to identify the members of the surface water subclass.

The shortcomings are even more pronounced with respect to the groundwater subclass. Although plaintiffs assert that contaminants have migrated offsite from the Olin facility via groundwater, they acknowledge that they do not know the scope of the groundwater subclass because they do not know the extent of the offsite groundwater contamination. (Plaintiffs' Brief, at 8.)[67] Nevertheless, they urge the Court to certify the groundwater subclass conditionally, "subject to further definition and refinement" at an unspecified future date via unspecified future mechanisms. (*Id.*) Plaintiffs speculate that it is "likely" that the groundwater subclass will be subsumed within the geographic boundaries of the air subclass. (*Id.* at 8-9.) Such contentions are rife with inadequacies. Plaintiffs' groundwater expert, Dr. Phillip Bedient, testified that there is no way to determine the geographic scope of the alleged offsite groundwater contamination given the data inadequacies.[68] Moreover, not a single one of plaintiffs' water samples taken offsite tested at above background levels for mercury. (Exh. P-12, at 322; Tr., at 238-42, 333-36.) Testing of monitoring wells near the southern edge of Olin's property reflects no

---

unknown, yet-to-be-unveiled methodology.

[67]    In their opening statement during the class certification hearing, plaintiffs' counsel stated, "We admit the groundwater plume is not well defined." (Tr., at 37.)

[68]    The following exchange from Dr. Bedient's deposition is instructive:

"Q:    If I understood your testimony so far, there is simply no way to determine with any precision the off-site impact, historical off-site impact of groundwater from the Olin site because of the lack of off-site monitoring wells. Is that correct?

"A:    Well, yeah. There's no way to determine exactly what it is .... But, in other words, can I – can I tell you exactly where it is? No, I cannot.
                    *                    *                    *
"A:    It's unfortunate. The data just doesn't exist."

(Exh. P-3, at 98-99.) Dr. Bedient also testified to a "paucity of data in terms of monitoring points due south of the facility," and indicated that the contamination line "could be drawn in any number of ways." (*Id.* at 35, 195.) At the Rule 23 hearing, Dr. Bedient acknowledged that groundwater flow directions are constantly shifting and changing, that there are no wells to confirm or deny offsite historical contamination, and that he cannot trace a plume of groundwater mercury contamination. (Tr., at 331, 333.)

-47-

significant levels of mercury contamination in the groundwater leaving Olin since 1991. (Exh. P-12, at 322-23; Tr., at 239-40, 387-89.) In acknowledging these facts, the Court is not making any value judgment as to the merits of plaintiffs' groundwater contamination claims.[69] Rather, the point is that plaintiffs do not presently have any data that might enable them to delineate the scope of a groundwater class, and have not offered any indication that any such data might reasonably become available in the future.[70] It appears that the groundwater class could be defined only by speculation as to whether the groundwater was contaminated and where it might have traveled.

Rather than tracing the boundaries of the surface water and groundwater subclasses in a meaningful way, plaintiffs explain with a sleight of hand that these subclasses will be brought into focus at some unspecified future date through some unspecified mechanism. At that time, plaintiffs urge, the Court can revisit, modify or rescind the certification decision if necessary. (Plaintiffs' Brief, at 6-9; Reply Brief, at 47-48.) The Court cannot endorse this sort of presumptuous "shoot first, ask questions later" approach to class certification. Plaintiffs are effectively asking this Court to accept on faith that they will formulate a meaningful, appropriate, reasonable definition of their surface water and groundwater subclasses during the merits phase. But this action is already 27 months old, and plaintiffs have been unable thus far to sculpt the perimeter of these two subclasses despite the focus of the

---

[69] As discussed *supra*, the Court recognizes that class certification proceedings are not a platform for delving into the merits. The Court is not doing so here, but is instead reviewing the extant evidence for any indication that plaintiffs might be able to generate data to ascertain and define the scope of the groundwater class. Their research and field testing to date counsels a resoundingly negative response.

[70] Plaintiffs attempt to explain away this shortcoming by blaming defendants for the lack of data. According to plaintiffs, "[t]he fact that the groundwater subclass is subject to further definition and refinement is a result of Defendants' conduct," namely "Defendants' failure to test offsite groundwater when Defendants **knew** that their groundwater plumes of contamination had migrated offsite." (Reply Brief, at 3.) There is certainly record evidence that Olin neglected to engage in such offsite testing; however, plaintiffs provide no authority for the proposition that a defendant is under a legal obligation to collect and preserve data for possible use by plaintiffs in pursuing class action claims against it. It is plaintiffs' burden – not defendants' – to define their class adequately. Plaintiffs' failure to do so cannot be excused because defendants failed to compile data 20 years ago that might have assisted plaintiffs in this endeavor.

proceedings to date on class certification issues. They offer no reason to believe that they will be able to do so between now and trial. Accordingly, the Court cannot and will not certify amorphous, ill-defined subclasses based on mere speculation that plaintiffs might someday formulate meaningful definitions for those subclasses, predicated on objective criteria that will not necessitate extensive individualized fact-finding and mini-hearings to determine each prospective class member's status vis a vis the class.

For all of the foregoing reasons, it is the opinion of the undersigned that the air subclass of Class A is properly defined, but that the surface water and groundwater subclasses are not. Because the surface water and groundwater subclasses flunk the definability requirement, plaintiffs' bid for class certification must be rejected as to those two subclasses.

**V.      Rule 23(a) Considerations as to Class A.**

Having concluded that at least one named plaintiff has standing to pursue at least trespass and wanton trespass claims on behalf of Class A, and that at least the air subclass has been properly defined, the Court now turns to the Rule 23(a) factors. For the sake of completeness, the Court will apply Rule 23(a) to the trespass and wanton trespass causes of action of plaintiff Pressley, and alternatively to all claims of all plaintiffs relating to Class A, irrespective of the standing defects identified above.[71] Where appropriate, the Court will also assess whether the surface water and groundwater subclasses could have satisfied Rule 23 elements, assuming they had been properly defined.

**A.      _Numerosity._**

The numerosity requirement obliges plaintiffs to show that "the class is so numerous that joinder of all members is impracticable." Rule 23(a)(1), Fed.R.Civ.P. No rigid numerical threshold must be met. _See Bacon v. Honda of America Mfg., Inc._, 370 F.3d 565, 570 (6th Cir. 2004) ("There is no automatic cut-off point at which the number of plaintiffs makes joinder impractical, thereby making a

---

[71]      The purpose of this double-tracked analysis is to demonstrate that even if the Class A claims of plaintiffs LaBauve, Lofton and Jordan were not barred for lack of standing based on a want of injury in fact, and even if plaintiff Pressley had standing to assert time-barred claims of negligence, fraud and the like, class certification would remain inappropriate for those claims and those plaintiffs pursuant to Rule 23.

-49-

class-action suit the only viable alternative."); *Silva-Arriaga v. Texas Exp., Inc.*, 222 F.R.D. 684, 688 (M.D. Fla. 2004) (explaining that no specific number of class members is required to show impracticability of joinder for Rule 23(a)(1) purposes). Nonetheless, the sheer number of potential class members may warrant a conclusion that Rule 23(a)(1) is satisfied. *See Bacon*, 370 F.3d at 570 (if there are more than several hundred class members, that fact favors numerosity). Numerosity is generally presumed when a proposed class exceeds 40 members. *See Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986); *Serventi v. Bucks Technical High School*, 225 F.R.D. 159, 165 (E.D. Pa. 2004) ("generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met"); *Dujanovic v. MortgageAmerica, Inc.*, 185 F.R.D. 660, 666 (N.D. Ala. 1999) ("As a general rule, classes of more than 40 members are deemed to satisfy the numerosity requirement."). Other considerations for Rule 23(a)(1) purposes include geographic diversity of class members, judicial economy, and the ease of identifying and locating class members. *See Jones v. Roy*, 202 F.R.D. 658, 665-66 (M.D. Ala. 2001) (collecting cases).

Here, the air subclass proposed by plaintiffs includes all property owners within a clearly demarcated "zone of contamination" as delineated by Dr. Sajo's air dispersion model. Plaintiffs do not quantify the number of property owners within that 20 to 25 kilometer zone surrounding the Olin plant; however, it is reasonable to assume that these prospective class members number at least well into the hundreds. On its face, this formulation of the air subclass would appear to satisfy Rule 23(a)(1), inasmuch as joinder of so many prospective plaintiffs would almost certainly be rendered impracticable by their sheer numbers.

Nonetheless, even in the face of plaintiffs' compelling showing that the air subclass will be hundreds of persons strong, defendants stubbornly refuse to concede the numerosity point.[72] In

_____

[72]    Particularly in a case of this magnitude, a litigant's interest is best served not by raising every conceivable argument (no matter how implausible or unpersuasive), but by judiciously identifying and pressing the stronger arguments while leaving the weaker ones behind. The parties would have benefitted from such a clear, focused approach, instead of forcing the Court to sift through plainly meritless contentions to locate the crux of the Rule 23 dispute. Defendants' insistence on contesting

particular, defendants assert that the numerosity requirement is not satisfied because the air subclass is dependent on Dr. Sajo's flawed models, which the Court should disregard. (Opposition Brief, at 31.) As the Court has explained *supra*, however, it is inappropriate to subject Dr. Sajo's research and testimony to a rigorous *Daubert*-style inquisition here, and Dr. Sajo's work is not so demonstrably faulty as to be inadmissible as a matter of law. *See generally O'Connor v. Boeing North American, Inc.*, 184 F.R.D. 311, 321 n.7 (C.D. Cal. 1998) (at class certification stage, "inquiry into the admissibility of Plaintiffs' proposed expert testimony as set forth in *Daubert* would be inappropriate"); *In re Polypropylene Carpet Antitrust Litig.*, 996 F. Supp. 18, 25-26 (N.D. Ga. 1997) (similar). Accordingly, the Court accepts Dr. Sajo's "zone of contamination" as identifying the air subclass, and the magnitude of that "zone" is plainly sufficient to render impracticable the joinder of the many hundreds of property owners encompassed within that "zone." Rule 23(a)(1) is satisfied.[73]

---

Rule 23(a)(1)'s applicability to the air subclass is one of the more obvious examples of needless detours imposed upon this Court by both sides' "slash-and-burn," "object-to-everything" strategy. Defendants have previously been admonished by this Court for such practices. *See* doc. 36, at 6 n.9 (observing that defendants' Motion to Dismiss appears, at least in part, to have been a "litigation tactic designed to 'send a message' to plaintiffs by forcing them to submit to the onerous and burdensome task of deflecting literally dozens of incorrect, but superficially plausible, legal arguments"). The Supreme Court has "recognized on numerous occasions that the process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail ... is the hallmark of effective appellate advocacy." *O'Sullivan v. Boerckel*, 526 U.S. 838, 858, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999) (citation omitted). The same principles apply to effective trial advocacy.

[73]    As a fallback position, defendants contend that class certification will disserve the objective of judicial economy (which may properly be weighed in the numerosity calculus) because there are several other individual and class action lawsuits pending, and there is no indication that certification would consolidate or prevent future claims. (Opposition Brief, at 32-33.) This argument is disingenuous at best. The individual actions are personal injury cases, while this litigation is confined to property damage. The other two class actions involve different defendants (the *Fisher* case) or different types of claims (the *Ware* case) than those raised here. Defendants can identify no other pending lawsuit in which McIntosh plaintiffs seek to recover from Olin for property damage arising from alleged mercury contamination. There is no multiplicity of pending lawsuits to address this issue; to the contrary, this case stands alone. As such, defendants' suggestion that judicial economy would not be promoted by certifying a class here because plaintiffs are filing other, identical lawsuits is simply incorrect. Nor can the Court accept defendants' position that the individual actions prove that plaintiffs have the resources to institute individual suits for the types of claims being pursued here. The two

-51-

The same is not true of the groundwater and surface water subclasses.  Plaintiffs have made no showing from which any reasonable conclusion could be drawn as to the number of property owners afflicted by alleged surface water and groundwater contamination emanating from the Olin plant. Monitoring well data reveals that there has been no contaminated groundwater leaving the southern boundary of the McIntosh site for well over a decade, and plaintiffs' testing yielded only two samples of surface water that show appreciable mercury contamination (one or both of which may be on Olin property or public waterways, not on class members' property).[74]  Thus, there is no indication in the record that any sizeable numbers of property owners have or may have experienced property devaluation by virtue of surface water or groundwater contamination because of Olin's activities.  There is no reason to believe that joinder of any individuals who have sustained such harms would be impracticable; therefore, even if the surface water and groundwater subclasses were properly defined, they fail to satisfy the numerosity requirement set forth in Rule 23(a)(1).[75]

_____

individual actions in question are for personal injuries, one involving the death of a child and the other involving a man who developed gastric cancer. Obviously, the litigation economics of these types of potentially high-dollar personal injury cases are vastly different than those confronting plaintiffs in this case, where each plaintiff seeks a much more modest recovery for alleged property devaluation.  The Court therefore cannot find that the *Et-Tawil* and *Weaver* lawsuits prove that individual plaintiffs can afford to bring separate lawsuits against Olin for the kinds of damages claimed here.

[74]    At the hearing, Kaltofen testified that he took 30 water samples in and around McIntosh, but that only two of them returned levels of mercury above "non-detect" levels.  Of those two samples, one was located on a roadside that Kaltofen acknowledged might be Olin property, while the other was taken from Round Pond, a body of water that may be either Olin property or a public waterway.  (Tr., at 238-41.)

[75]    The key definitional distinction among these subclasses for purposes of Rule 23(a)(1) is that plaintiffs define the air subclass as including all property owners in a "zone of contamination," but would apparently restrict the surface water and groundwater subclasses to those property owners whose property was actually damaged by contamination borne of running water, whether above or below ground.  There being no indication that those subsets of property owners are too numerous to accommodate joinder (and, indeed, no evidence that any property owner is presently suffering from mercury contamination from Olin through the surface water or groundwater pathways), the numerosity criterion is plainly not satisfied as to them.

### B.    Commonality/Typicality.

The Federal Rules of Civil Procedure authorize class certification only where "there are questions of law or fact common to the class" (the "commonality" requirement) and "the claims or defenses of the representative parties are typical of the claims or defenses of the class" (the "typicality" requirement).  Rule 23(a)(2), (3).  The Eleventh Circuit has opined that these requirements, while distinct, are interrelated and overlapping, inasmuch as "[b]oth requirements focus on whether a sufficient nexus exists" between the claims of class representatives and those of other class members to warrant class certification.  *Cooper v. Southern Co*, 390 F.3d 695, 713 (11th Cir. 2004) (quoting *Prado-Steiman v. Bush*, 221 F.3d 1266, 1278 (11th Cir. 2000)); *see also General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n.13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) ("The commonality and typicality requirements of Rule 23(a) tend to merge."); *Prado-Steiman*, 221 F.3d at 1278-79 ("the commonality and typicality requirements of Rule 23(a) overlap").[76]  The critical function of the typicality / commonality inquiry is to verify that named plaintiffs' incentives are aligned with those of absent class members to ensure that the latter's interests are properly served.  *See Prado-Steiman*, 221 F.3d at 1279.  The Court will consider the commonality and typicality requirements separately, but recognizes that the distinctions between them may be blurry.

####      1.    Commonality Requirement.

Rule 23(a)(2)'s commonality prerequisite contemplates that "a class action must involve issues that are susceptible to class-wide proof."  *Cooper*, 390 F.3d at 714 (citation omitted).  "A court cannot simply presume that the commonality requirement has been satisfied; the plaintiff bears the burden of proof on this issue."  *Nelson v. U.S. Steel Corp.*, 709 F.2d 675, 679 -80 (11th Cir. 1983) (at class certification stage, plaintiff is obligated to show, in at least a preliminary fashion, commonality

---

[76]      Typicality and commonality are generally distinguished by positing that the former weighs individual characteristics of a named plaintiff relative to the class, while the latter examines the group characteristics of the class as a whole.  *See Cooper*, 390 F.3d at 714; *see also Piazza v. Ebsco Industries, Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001) ("Traditionally, commonality refers to the group characteristics of the class as a whole, while typicality refers to the individual characteristics of the named plaintiff in relation to the class.").

between her claims and those of putative class).  To meet this burden, "[i]t is not necessary that all of the questions raised by arguments are identical; it is sufficient if a single common issue is shared by the class." *Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 226 F.R.D. 446, 449 (S.D.N.Y. 2005); *see also Amone v. Aveiro*, 226 F.R.D. 677, 684 (D. Haw. 2005) ("Commonality is established by the existence of shared legal issues with divergent factual predicates or a common core of salient facts coupled with disparate legal remedies within the class.") (citation omitted).

The commonality requirement is not a stringent threshold and does not impose an unwieldy burden on plaintiffs.  *See Dujanovic v. MortgageAmerica, Inc.*, 185 F.R.D. 660, 667 (N.D. Ala. 1999) (characterizing Rule 23(a)(2) burden as "not high"); *Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 627 (3rd Cir. 1996) (recognizing "very low threshold for commonality").  In fact, as a general rule, all that is necessary to satisfy Rule 23(a)(2) is an allegation of a standardized, uniform course of conduct by defendants affecting plaintiffs.  *See, e.g., Bentley v. Honeywell Intern., Inc.*, 223 F.R.D. 471, 481 (S.D. Ohio 2004) ("when defendants' conduct towards the proposed class is alleged to be uniform, the commonality requirement is met."); *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 697 (S.D. Fla. 2004) ("The commonality element is generally satisfied when a plaintiff alleges that defendants have engaged in a standardized course of conduct that affects all class members.").  Plaintiffs need only show a "common nucleus of operative facts" to satisfy Rule 23(a)(2).  *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 581 (N.D. Ill. 2005); *In re Currency Conversion Fee Antitrust Litigation*, 224 F.R.D. 555, 562 (S.D.N.Y. 2004) ("the commonality requirement does not require that each class member have identical claims as long as at least one common question of fact or law is evident"); *Bentley*, 223 F.R.D. at 479 (observing that factual dissimilarities among class members' claims do not, in and of themselves, warrant denial of class certification on commonality grounds).

In briefing Rule 23(a)(2), both parties have obscured the applicable legal standard.[77]  The

---

[77]    Indeed, plaintiffs spend the bulk of their commonality discussion addressing the Rule 23(b)(3) predominance requirement, a separate prerequisite with much different features and a different legal standard than Rule 23(a)(2) commonality.  (Plaintiffs' Brief, at 61-66; Reply Brief, at 49-50.) Plaintiffs' evident confusion of commonality and predominance elements renders their Rule 23(a)(2)

-54-

touchstone of a commonality analysis is not whether any issues will require individualized proof, as defendants attempt to show.  Likewise, the commonality requirement does not hinge on the outcome of a balancing test to whether any common issues do or do not predominate over their individual counterparts, as plaintiffs would argue.  Rather, as shown by the legion authorities above, the critical question for commonality purposes is whether common core issues of fact are present.  They unquestionably are.  The Class A plaintiffs allege that Olin engaged in a unitary, singular course of conduct against them by emitting mercury vapor into the air, which was then deposited on their properties by wind or rain, and subsequently engaging in deceptive conduct to conceal their polluting activities and the offsite impact of same.  The Court does not doubt that numerous issues in this litigation will require individualized proof.  Nonetheless, the existence of a core nucleus of common factual issues (*e.g.*, did Olin contamination travel offsite, and if so, what contaminants were released, when and how were they released, and did Olin mislead the community as to those contaminants) is sufficient to satisfy the commonality requirements, irrespective of countervailing individual issues.  It being beyond serious dispute that this litigation involves at least certain issues that are susceptible to class-wide proof, Rule 23(a)(2) is satisfied, regardless of whether other issues require individual proof.[78]

### 2.    *Typicality Requirement.*

To comport with Rule 23(a)(3), plaintiffs must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  *Id.*  Simply put, class representatives "must possess the same interest and suffer the same injury as the class members in

---

discussion largely unhelpful.  For their part, defendants stress that an array of issues in this action will require individualized proof, including statute of limitations; existence, nature and extent of contamination; alleged fraud by defendants; and damages.  (Opposition Brief, at 33-37.)  Of course, defendants' position is in no way inconsistent with Rule 23(a)(2) commonality, as a commonality finding and individual-specific issues can and do coexist peacefully.

[78]    That said, the Court recognizes that commonality in this case is limited by plaintiffs' lumping together in the same class property owners who Dr. Sajo estimates received airborne mercury deposition totaling 600 ppb with property owners who Dr. Sajo estimates received airborne mercury deposits totaling just 6 ppb.  Obviously, there may be substantial factual and legal divergence between the claims of such plaintiffs (including whether the 6 ppb class member suffered a legally cognizable injury at all); nevertheless, the low commonality threshold is satisfied.

order to be typical under Rule 23(a)(3)." *Cooper*, 390 F.3d at 713 (citation omitted). The key to this inquiry is whether class representatives' claims are similar to those of putative class members. *See Hines v. Widnall*, 334 F.3d 1253, 1257 (11th Cir. 2003). In other words, the typicality requirement turns on whether the claims of class representatives are "reasonably co-extensive" with those of other plaintiffs, in terms of class representatives' individual circumstances and the legal theories upon which they proceed. *Tanne v. Autobytel, Inc.*, 226 F.R.D. 659, 667 (C.D. Cal. 2005). Rule 23(a)(3) is satisfied if the plaintiffs show that the same practice or course of conduct by defendants affected both the named class representatives and the absent class members, and that the class representatives' claims are based on the same legal theories as those of their class member counterparts. *See Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984) (opining that typicality is satisfied if claims of class representatives and other class members arise from same events and are based on same legal theory); *Weiss*, 226 F.R.D. at 450 ("The typicality requirement of Rule 23(a)(3) is satisfied if the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members."); *Agan*, 222 F.R.D. at 698 ("If parties seeking class certification can establish that the same unlawful conduct was directed at or affected both the class representatives and the class itself, then the typicality requirement is usually met irrespective of varying fact patterns which underlie the individual claims."); *Noble v. 93 University Place Corp.*, 224 F.R.D. 330, 338 (S.D.N.Y. 2004) ("A class representative's claims are "typical" under Rule 23(a)(3), where each class member's claims arise from the same course of events and each class member makes similar legal arguments to prove defendants' liability."); *Wright v. Circuit City Stores, Inc.*, 201 F.R.D. 526, 542-43 (N.D. Ala. 2001) (noting that Rule 23(a)(3) requires only that class representatives' claims arise from same broad course of conduct and be based on same legal theory as those of other plaintiffs).

Here, the named plaintiffs' claims are clearly based on the same course of conduct and rely on similar, if not identical, legal arguments as those of other class members. All plaintiffs contend that defendants engaged in a pattern of environmental contamination through air, surface water, and groundwater pathways over a period of many years. All plaintiffs propound the same or similar legal

-56-

theories in support of their claims.  On this record, there is plainly a sufficient nexus between the claims of the class representatives and those of the class members at large to satisfy the typicality requirement.[79]

Under any reasonable application of Rule 23(a)(3), it is clear that the incentives of the named plaintiffs are aligned with those of the absent class members in such a manner as to ensure that they will fully and fairly represent the interests of other class members.  In other words, the claims of the named plaintiffs and the other class members, at least as to Class A, are interrelated and are predicated on the same legal theories and the same alleged wrongdoing by defendants, notwithstanding the potential for significant factual differences in each plaintiff's claims.[80]  Nothing further is required to prove typicality.

### *C.    Adequacy.*

The fourth Rule 23(a) factor requires a showing that "the representative parties will fairly and

---

[79]    In opposition to the Class Certification Motion, defendants again trumpet the not insubstantial factual differences among various plaintiffs' claims.  However, such distinctions are legally inconsequential under Rule 23(a)(3), as long as the named plaintiffs' claims arise from the same course of conduct and proceed from the same legal theories as those of other class members.  *See Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001) (existence of substantial factual differences is no impediment to typicality finding, given strong similarity of legal theories); *Matyasovszky v. Housing Authority of City of Bridgeport*, 226 F.R.D. 35, 42 (D. Conn. 2005) ("Factual differences will not render a claim atypical if the plaintiff's claims arise from the same event or practice or course of conduct that gives rise to the claims of the class members, and if they are based on the same legal theory."); *Yong Soon Oh v. AT & T Corp.*, 225 F.R.D. 142, 145 (D.N.J. 2004) ("A claim will not be deemed atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.") (citations omitted).  Defendants' point may have merit in the Rule 23(b)(3) context, but it certainly does not preclude a typicality finding.

[80]    A caveat to this discussion is that plaintiffs do not satisfy the typicality requirement to the extent that they lack standing.  After all, the law is clear that "[w]ithout individual standing to raise a legal claim, a named representative does not have the requisite typicality to raise the same claim on behalf of a class."  *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000).  Thus, typicality is lacking to the extent that plaintiffs LaBauve, Lofton, and Jordan do not possess standing to pursue any Class A claims, and plaintiff Pressley does not possess standing to pursue any Class A claims other than those for trespass and wantonness.  To clarify, then, the Court finds that plaintiff Pressley's claims of trespass and wantonness satisfy the typicality requirement of Rule 23(a)(3), while the class representatives' other Class A claims do not.

-57-

adequately protect the interests of the class." Rule 23(a)(4), Fed.R.Civ.P.[81]  The adequacy element is intended to ascertain whether a representative plaintiff will sufficiently safeguard the interests of other class members.  *See Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003).  As one district court succinctly put it, "[t]he named plaintiff's adequacy to represent the putative class is established where the said plaintiff 1) has common interests with the unnamed class members, 2) will vigorously prosecute the interests of the class through qualified counsel, and 3) has no antagonistic interests with the interests of the class."  *In re Consolidated Non-Filing Ins. Fee Litigation*, 195 F.R.D. 684, 691 (M.D. Ala. 2000); *see also Valley Drug*, 350 F.3d at 1189 (explaining that Rule 23(a)(4) precludes class certification where economic interests and objectives of named plaintiffs differ significantly from those of unnamed class members).[82]  "Antagonistic interests" means a fundamental conflict, including circumstances where certain plaintiffs claim to have been harmed by conduct that benefitted other class members.  *See Valley Drug*, 350 F.3d at 1189.

Upon careful review of the record, the Court has no difficulty concluding that Rule 23(a)(4) is satisfied.  After all, the commonality of the named plaintiffs' interests with those of other class members has already been established *supra*, and there is no reason to believe that the named plaintiffs will not vigorously prosecute class interests or that the named plaintiffs' interests are somehow at loggerheads

---

[81]    Plaintiffs contend, without citations to authority, that "[a]dequacy is presumed and the burden is on the party opposing class certification to demonstrate that the proposed representation will be inadequate."  (Plaintiffs' Brief, at 76.)  However, the Eleventh Circuit has cited with approval authority from other jurisdictions declaring that proving adequacy is plaintiffs' responsibility and that plaintiffs are entitled to no such presumption.  *See London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003.)  Thus, the Court declines to presume that plaintiffs satisfy Rule 23(a)(4).

[82]    The adequacy requirement applies to both the named plaintiffs and their counsel.  *London*, 340 F.3d at 1253; *see also Wright*, 201 F.R.D. at 545 (adequacy requirement obliges court to determine "that the plaintiff's attorney is qualified, experienced, and will competently and vigorously prosecute the suit," as well as that the class representative's interests are not antagonistic to or in conflict with those of class members).  In this case, there has been no challenge to the qualifications, experience, or competence of plaintiffs' legal team, nor could any such argument plausibly be asserted given the excellent credentials and obvious diligence and vigor of class counsel in litigating this action.  (*See* Plaintiffs' Brief, at 78-81.)  There being no basis for disputing the adequacy of plaintiffs' counsel, the Court will focus on the adequacy of the class representatives themselves.

with those of the rest of the class. Plaintiffs have shown to the Court's satisfaction that they are adequate to represent the interests of the class.[83]

## VI.    Rule 23(b) Requirement as to Class A.

Assuming that plaintiffs can successfully traverse all four of the Rule 23(a) hurdles with respect to proposed Class A (or some portion of same), their quest for class certification would nonetheless fail absent satisfaction of one prong of Rule 23(b). Here, plaintiffs invoke Rule 23(b)(3), which requires a showing that common questions predominate over individual questions and that the class action mechanism is superior to other methods for fair and efficient adjudication of the dispute.[84] The predominance and superiority requirements are properly viewed as supplementary to those of Rule 23(a). *See Cooper*, 390 F.3d at 722.[85]

---

[83]    In opposing the adequacy element, defendants suggest that the class representatives' individual circumstances deviate from those of the class, thereby undermining the likelihood of vigorous representation and raising the specter of antagonistic interests. (Opposition Brief, at 39.) Accepting defendants' position that levels of contamination vary widely from plaintiff to plaintiff and that defenses such as statute of limitations and causation may vary from plaintiff to plaintiff, the Court nonetheless perceives no basis for concluding that such differences will create conflicts between class representatives and the class, or inhibit their diligent, vigorous prosecution of class claims. Stated differently, that class representatives' claims and circumstances may not be identical to those of other class members is no reason to deem them inadequate. *Compare Coleman v. Cannon Oil Co.*, 141 F.R.D. 516, 524 (M.D. Ala. 1992) (explaining that class representative is inadequate under Rule 23(a) "where he has no damages and where he proceeds on an entirely different legal theory than does the class he purportedly represents"). Pursuing and protecting class members' claims is certainly not mutually exclusive to, much less in conflict with, litigating individual issues that may arise in the class representatives' own claims. *See Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir. 1996).

[84]    Rule 23(b)(3) states that a class action may be maintained only if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Id.*

[85]    In determining whether these criteria are satisfied, courts consider such factors as "the interest of members of the class in individually controlling the prosecution or defense of separate actions," "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class," "the desirability or undesirability of concentrating the litigation of the

### A.    *Predominance Requirement.*

#### 1.    *Legal Standard.*

With respect to predominance, the rule provides that class certification is proper pursuant to Rule 23(b)(3) only where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members."  *Id.*  As the Advisory Committee noted, "[i]t is only where this predominance exists that economies can be achieved by means of the class-action device."  Rule 23(b)(3), Advisory Notes to 1966 Amendment.  Although superficially similar, the Rule 23(b)(3) predominance requirement is "far more demanding" than the Rule 23(a) commonality requirement.  *Cooper*, 390 F.3d at 722; *see also Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir.1997) ("The predominance inquiry ... is far more demanding than Rule 23(a)'s commonality requirement."); *Noble*, 224 F.R.D. at 339 (similar); *O'Connor v. Boeing North American, Inc.*, 184 F.R.D. 311, 339 (C.D. Cal. 1998) ("For the proponent to satisfy the predominance inquiry, it is not enough to establish that common questions of law or fact merely exist, as it is under Rule 23(a)(2)'s commonality requirement.").  The predominance requirement is manifestly not satisfied if, as a practical matter, resolution of common issues will "break[] down into an unmanageable variety of individual legal and factual issues."  *Cooper*, 390 F.3d at 722 (quoting *Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir. 1996)).  Thus, the Eleventh Circuit has declared that Rule 23(b)(3) cannot be satisfied when it appears that most of plaintiffs' claims will stand or fall depending on individual-specific factual issues.  *See Cooper*, 390 F.3d at 722.

Last year, the Eleventh Circuit issued a definitive opinion on the meaning and application of the predominance requirement in *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004).  That ruling is highly instructive here.  The *Klay* court reasoned that "[w]here, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)."  *Id.* at 1255.  An alternative formulation of

--------

claims in the particular forum," and "the difficulties likely to be encountered in the management of a class action."  Rule 23(b)(3), Fed.R.Civ.P.

the predominance criterion is whether addition of more plaintiffs to the class would require presentation of significant amounts of new evidence. *Id.* If the answer to that question is affirmative, then it is likely that individual issues predominate over their common counterparts. *Id.*

Applying this standard, the *Klay* panel held that the district court abused its discretion in certifying a class under Rule 23(b)(3) as to certain state-law claims because the case involved plaintiffs who suffered "varying types of injury ... through different causal mechanisms, thereby creating many separate issues," with "[n]o single proximate cause [that] applies equally to each potential class member and each defendant." 382 F.3d at 1265 (citations omitted). *Klay* involved civil RICO and state-law claims arising from allegations that the defendants (health care entities responsible for reimbursing physicians in HMOs) had allegedly programmed computers to underpay plaintiffs (a putative class of physicians) on those reimbursements. The fundamental problem in *Klay* was that the classwide proof showed only that defendants had sometimes programmed computers to defraud doctors out of reimbursement funds, through a variety of techniques, but did not show that any particular doctor had been cheated on any particular occasion, or by how much. *Id.* at 1266-67. Thus, even if plaintiffs could prove that defendants conspired against them and sometimes underpaid or delayed payments improperly, each plaintiff would still have to prove independently, by facts specific to him, that his payments had been improperly reduced or delayed. *Id.* at 1268. *Klay* contrasted this scenario with several actions in which the Eleventh Circuit upheld class certification where the evidence was that defendants had harmed each putative plaintiff in exactly the same way, albeit not in the same exact dollar amount. *Id.*[86] In light of these concerns, the Eleventh Circuit held that "even though the plaintiffs'

---

[86]    For example, in *Allapattah Services, Inc. v. Exxon Corp.*, 333 F.3d 1248 (11th Cir. 2003), plaintiffs were Exxon dealers who sued Exxon Corp. for overcharging them for fuel purchases by secretly eliminating a promised 1.7 cent-per-gallon discount. Each plaintiff was harmed in the same manner by the same course of conduct, inasmuch as he had been forced to overpay for fuel from Exxon by 1.7 cents per gallon during the period of the breach. Likewise, in *Roper v. Consurve, Inc.*, 578 F.2d 1106 (5th Cir. 1978), the plaintiffs were credit card holders who contended that the defendant credit card company had charged them usurious interest rates by using an illegal formula to determine when interest accrued on certain purchases. Again, each plaintiff was harmed in the same manner by the defendant, even though not in the same amount. The *Klay* court contrasted *Allapattah* and *Roper* with the circumstances that it confronted, wherein even if plaintiffs could show that defendants had

breach of contract claims involve some relatively simple common issues of law and possibly some common issues of fact, individualized issues of fact predominate." *Klay*, 382 F.3d at 1267.[87]

2.    <em>Application of Rule 23(b)(3) Standard to Plaintiffs' Claims.</em>

A helpful starting point in conducting the Rule 23(b)(3) weighing of common and individualized issues is to outline exactly which factual and legal issues are common to the class, and which are plaintiff-specific. Undoubtedly, this case features a nucleus of common factual issues relating to defendants' conduct. Whether Olin released mercury, whether such mercury migrated offsite, where the mercury traveled when it left Olin property, the pathway(s) through which it was transported, and the time period of the alleged mercury contamination are all common questions of fact. Similarly, classwide determinations can likely be made as to whether defendants made fraudulent misrepresentations or wrongfully concealed information regarding the existence and scope of contamination, based on common factual findings regarding what defendants said, when they said it, and what they knew or reasonably should have known at the time they made such statements. The Court expects that the proof for these issues relating to Olin's course of conduct will be consistent across all plaintiffs.

However, numerous other fundamental issues will demand individual-specific resolution. Whether a plaintiff's property is contaminated, the source(s) of such contamination, the extent of such contamination, the cause and timing of harm, and the resulting damage (measured in diminution of property value) are all questions that will require plaintiff-by-plaintiff scrutiny. Likewise, the plaintiffs' awareness of and reliance on allegedly fraudulent statements and reassurances by Olin must necessarily

---

engaged in unlawful practices, "they would still need extensive individualized proof regarding which plaintiffs have been harmed and in what ways." *Klay*, 382 F.3d at 1267.

[87]    *Klay*'s resolution of the Rule 23(b)(3) issue is echoed in other federal decisions in a variety of jurisdictions and contexts. *See, e.g., Perez v. Metabolife Intern., Inc.*, 218 F.R.D. 262, 273 (S.D. Fla. 2003) (predomination requirement not satisfied in medical monitoring action where most elements of claims require individualized proof, such that efficiency gained by deciding common elements will be lost by individual determinations); *Noble*, 224 F.R.D. at 339 ("Because Rule 23(b)(3) requires that common issues predominate, courts often deny certification ... where resolving the claims for relief would require individualized inquiries.").

-62-

be resolved on an individualized basis.  Furthermore, inasmuch as defendants have interposed a limitations defense, individualized inquiry will be needed to ascertain when each plaintiff knew or should have known of the alleged contamination.

In balancing these competing considerations, the Court looks to the *Klay* standard of whether, after adjudication of classwide issues, plaintiffs would still need to introduce extensive individualized proof or argue substantial individualized legal points to establish most of the elements of their claims. This question is answered in the affirmative.

Three examples will illustrate the point.  First, under Alabama law a plaintiff cannot prevail on an indirect trespass claim for release of foreign polluting matter onto his property unless he proves the following elements: "1) an invasion affecting an interest in the exclusive possession of his property; 2) an intentional doing of the act which results in the invasion; 3) reasonable foreseeability that the act done could result in an invasion of plaintiff's possessory interest; and 4) substantial damage to the *res*." *Russell Corp. v. Sullivan*, 790 So.2d 940, 947 (Ala. 2001) (citation omitted); *see also Snyder v. Howard Plumbing and Heating Co.*, 792 So.2d 425, 428 (Ala.Civ.App. 2000).  Even if plaintiffs proved all the common issues showing a history of releases of toxic materials by Olin, each plaintiff would still have to make an individual showing of the first and fourth elements (and perhaps also the third, depending on the plaintiff's proximity to Olin), requiring substantial individualized proof and legal argument.  Second, plaintiffs' nuisance claims require proof of (1) activities that worked hurt, inconvenience, or damage to the complaining party, (2) breach of a legal duty owed, (3) causal relation between the conduct or activity complained of and the hurt, inconvenience, or damage sued for, and (4) damages.  *See Tipler v. McKenzie Tank Lines*, 547 So.2d 438, 440 (Ala. 1989).  The classwide proof may establish the second of those nuisance elements, but considerable individualized showings would be necessary as to each of the other three nuisance elements.

Third, plaintiffs' fraud claims generally require a showing that defendants made a false representation concerning a material fact, that defendants knew the statement was false or made it in reckless disregard for its truth or falsity, that the plaintiff reasonably relied upon such statement, and that the plaintiff was damaged by virtue of such reliance.  *See, e.g., Reynolds Metals Co. v. Hill*, 825

-63-

So.2d 100, 105 (Ala. 2002). Classwide evidence may establish that defendants made certain misrepresentations regarding offsite contamination; however, different plaintiffs will almost certainly have become aware of different representations at different times (if ever),[88] and will have reacted differently to such awareness. As such, plaintiffs' fraud-related claims will inevitably become mired in individual-specific inquiries about which representations by defendants were heard by each plaintiff, whether and how each plaintiff relied on such representations, whether such reliance was reasonable given other information that may have been known by or reasonably available to that plaintiff, and whether and how that plaintiff was damaged by virtue of any such reasonable reliance. Thus, the bulk of the proof regarding plaintiffs' fraud claims will be individualized in nature.[89]

---

[88]    For example, plaintiffs impute fraudulent statements to defendants through a variety of media, including without limitation newspaper articles, town meetings, and statements to regulators that were subsequently transmitted via mail or electronically disseminated to the public. An individualized inquiry will be essential to determine which plaintiffs were exposed to which of these methods of communication at which particular times, which of them were even aware of Olin's purported representations set forth in those fora, and how each plaintiff may have reacted to such information.

[89]    In so stating, the Court does not hold that the mere existence of fraud claims, without more, is automatically fatal to plaintiffs' bid for class certification. The law is otherwise. *See Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 724-25 (11th Cir. 1987) (deeming Rule 23(b)(3) satisfied as to plaintiffs' misrepresentation claims, inasmuch as "the mere presence of the factual issue of individual reliance could not render the claims unsuitable for class treatment"); *see also Klay*, 382 F.3d at 1258 (observing that "the simple fact that reliance is an element in a cause of action is not an absolute bar to class certification"); *but see Castano v. American Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) ("a fraud cause of action cannot be certified when individual reliance will be an issue") (*citing Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 882 (5th Cir. 1973)). Nonetheless, even where a common core of facts exists, "a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made ***or in the kinds or degrees of reliance by the persons to whom they were addressed***." Rule 23(b)(3), Advisory Notes to 1966 Amendment (emphasis added); *see also Clopton v. Budget Rent A Car Corp.*, 197 F.R.D. 502, 509 (N.D. Ala. 2000) (RICO and fraud claims are not wholly subject to class-wide resolution because each plaintiff must demonstrate reliance); *Pipes v. American Sec. Ins. Co.*, 169 F.R.D. 382, 384 n.2 (N.D. Ala. 1996) (opining that individualized reliance issues almost always militate against class treatment of fraud claims). Thus, an accurate summary of the law is that while fraud claims requiring individual proof of reliance are not *per se* barred from class certification, material differences in the representations made or the reliance of the addressee may render such claims unsuitable for class treatment. Such is the case here.

-64-

### 3.    *Application of Rule 23(b)(3) to Limitations Defense.*

The primacy of individual-specific proof considerations is further magnified under the lens of defendants' statute of limitations defense.  There can be no reasonable debate that different plaintiffs became aware, or should have become aware, of the existence of their claims at different times.[90]  Thus, the FRCD will need to be fixed separately for each plaintiff based on a plethora of factors such as (a) whether and when he observed anything out of the ordinary on or near his property that might reasonably have led him to believe it was being contaminated by mercury from Olin; (b) whether and when he participated in any community organizations relating to Olin and Ciba contamination; (c) whether and when he was aware of any representations by Olin relating to the level of offsite contamination and, if so, whether and how he relied upon them; (d) whether and when he or any organization of which he was a member requested relief from Olin for alleged contamination; (e) whether and when he became aware of any news reports regarding alleged contamination emanating from the Olin site; (f) whether and when he sought out legal counsel to pursue potential contamination-related claims against Olin; (g) whether and when he first believed that Olin was contaminating his property; (h) whether and when he believed Olin's allegedly fraudulent representations regarding offsite contamination; and (i) whether and when he stopped believing such representations.[91]

---

[90]    Plaintiffs have candidly admitted in previous briefing that "[t]he issue is when should they have known. That time is not necessarily within each class members' knowledge, and may differ between Plaintiffs."  (Plaintiffs' Brief (doc. 51) dated March 17, 2004, at 6-7.)  Plaintiffs now attempt to recast that statement as a benign observation that "some members of the community still believe Defendants' fraudulent misrepresentations ..., not that every Plaintiff should be held to have known about their potential claims at differing times."  (Reply Brief dated March 21, 2005, at 15.)  The plain meaning of their March 2004 statement is the latter.  Despite their considerable attempts to backpeddle, plaintiffs cannot sidestep the unmistakable import of this previous admission, particularly when the record clearly shows that the "should have known" date may fluctuate dramatically for different plaintiffs.

[91]    These circumstances and the multiplicity of variables pertinent to the limitations inquiry here are in stark contrast to *In re Monumental Life Ins. Co.*, 365 F.3d 408 (5th Cir. 2004), in which the issue of constructive notice hinged on whether uniformly dispersed national media reports were sufficiently publicized to place plaintiffs on notice of defendants' alleged wrongdoing, such that constructive notice could be determined on a classwide basis.  *Id.* at 421.  The Court therefore cannot

The Court has already pored over extensive record evidence and devoted extensive analysis to evaluating the statute of limitations defense as it pertains to plaintiff Pressley.  *See supra*, at Section III.B.2.d.-f.  To gauge the applicable FRCD for each individual plaintiff, the Court would undoubtedly have to engage in a similarly detailed analysis tailored to each person's unique circumstances.[92]  Given that community agitation against Olin's alleged contaminating activities dates back to at least the early 1990s, it is probable that certain putative class members may have FRCDs predating six years before the filing of the Complaint, rendering all of their claims time barred.  It is likewise probable that certain class members had no knowledge, and no reason to know, of alleged contamination to their properties until the Complaint was filed on their behalf in August 2003, such that all of their claims are timely.  It is also virtually certain that other plaintiffs will be situated similarly to Pressley, with the 2-year limitations claims being time-barred while the 6-year limitations claims are timely.  Only after painstaking factfinding on a plaintiff-by-plaintiff basis will each plaintiff's status vis a vis the statute of limitations defense be ascertainable.[93]  Courts have found that disparate, individualized assessment of the statute of

---

agree with plaintiff's reliance on *Monumental*.

[92]    For confirmation of this inevitability, one need look no further than the parties' briefs on class certification.  Plaintiffs' reply devotes nearly 17 pages to a personalized analysis of the timeliness of the claims of named plaintiffs LaBauve, Pressley, Lofton, and Jordan, as well as those of putative class members Reverend George Curtis, Edgar Moss and Joannee Barnes, with detailed recitation of each person's protracted deposition testimony on timeliness issues, as well as other evidentiary considerations.  (Plaintiffs' Reply Brief, at 23-40.)  In so doing, plaintiffs tacitly acknowledge that determination of when the applicable limitations periods began to run as to each plaintiff requires extensive individualized evidence and approximately 2½ pages of legal analysis per plaintiff.

[93]    Plaintiffs argue that, because it is predicated on when they "reasonably should have known," the FRCD is "an objective standard that can be determined by common facts and application of the law."  (Reply Brief, at 51.)  The problem is that the "should have known" date turns on a host of individual-specific facts, not on some singular date common to the class as a whole.  Objective standard or not, there is no one FRCD "should have known" date applicable to all plaintiffs across the board, because their highly variable individual circumstances and awareness preclude simple universal application of a singular arbitrarily selected date.  Similarly, plaintiffs' protestations that defendants' "common practice of concealment" entitles them to a presumption of unawareness are unavailing, given evidence that (a) some plaintiffs rejected defendants' allegedly deceptive acts of concealment and (b) other plaintiffs were not even aware of any acts of concealment.  (Reply Brief, at 51.)  Under such

limitations issue itself may cause individual considerations to predominate for purposes of a Rule 23(b)(3) inquiry. *See O'Connor v. Boeing North American, Inc.*, 197 F.R.D. 404, 414 (C.D. Cal. 2000) ("Based on the individualized, fact-intensive nature of the necessary inquiry in this case, the statute of limitations issues preclude a finding that common issues predominate over individual issues."); *Corley v. Entergy Corp.*, 220 F.R.D. 478, 487-88 (E.D. Tex. 2004) (reasoning that limitations issues defeat predominance because issues of whether individual landowners' claims are timely and whether equitable tolling applies are not amenable to class treatment).

4.    *Application of Rule 23(b)(3) to Damages Issues.*

In this case, defendants devote considerable effort to arguing that damages calculations will necessarily be performed on an individualized basis. The mere fact of individualized damages computations does not defeat predominance. *See, e.g., Allapattah Services, Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("Numerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate."); *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) ("No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action."); *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 233 (7th Cir. 1983) ("It is very common for Rule 23(b)(3) class actions to involve differing damage awards for different class members."); *Morris v. Wachovia Securities, Inc.*, 223 F.R.D. 284, 299 (E.D. Va. 2004) ("differences in damages among the potential class members do not generally defeat predominance if liability is common to the class"). The *Klay* decision casts light on this issue, as the Eleventh Circuit explained that "where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification." *Klay*, 382 F.3d at 1259-60 (footnotes omitted). However, where there are significant individualized questions regarding liability, *Klay* counsels that the need for individualized assessments of damages may warrant denial of Rule

_____

highly variable circumstances, allegations of concealment do not entitle plaintiffs to a single, blanket, across-the-board FRCD.

-67-

23(b)(3) certification.  *Id.* at 1260.

Here the plaintiffs' damages expert, Dr. Robert Simons (who did not testify at the class certification hearing), has not yet performed any analysis of the diminution in value of the plaintiffs' property.[94]  Indeed, Dr. Simons testified that his work has been confined to reviewing literature and that he has not studied the diminution in property value for these plaintiffs.  (Exh. P-31, at 60-61.)  He has performed neither surveys nor analysis in an effort to quantify plaintiffs' damages.  (*Id.* at 115-16.)  Dr. Simons indicated that he will be able to utilize one or more of a laundry list of real estate analytical techniques to quantify the reduction in property values; however, he has not applied those methodologies to class members' properties to date, and was vague as to his intentions for doing so.  (Exh. P-48, at 3-4.)  Despite the paucity of analysis, Dr. Simons' report optimistically concludes in the most conclusory of terms that plaintiffs' property values "can be modeled and calculated on a class-wide basis through a common, formulaic methodology as to all the property owners in the proposed class."  (*Id.* at 13.)

Review of the record reveals that Dr. Simons' rosy, conclusory prognostications of a "common, formulaic methodology" obscure numerous conceptual and practical obstacles almost certain to negate straightforward use of an across-the-board formula.  Dr. Simons is on record as agreeing that the

---

[94]     Plaintiffs theorize that mercury contamination by defendants diminished the value of their properties.  But Dr. Simons has acknowledged that if property is contaminated but no one knows it, there will be no diminution in value because the market cannot react to information it does not have.  (Exh. P-31, at 127-28.)  Meanwhile, plaintiffs claim not to have known or had reason to know of the alleged contamination until February 2004 (or six months after they filed suit), and further claim that certain class members are ignorant of contamination on their properties even today.  As such, it is unclear how plaintiffs contend the real estate market could have penalized them prior to August 2003 for fraudulently concealed contamination by Olin of which even the property owners themselves were unaware, and of which many of them remain unaware today.  This inconsistency is even more glaring when one bears in mind that the hundreds of prospective class members are all participants in "the market."  Thus, plaintiffs would apparently have the Court find that they were unaware of Olin-caused contamination to their own property until February 2004, even as those same plaintiffs collectively made a downward adjustment in their valuation of their neighbors' property because they knew that the neighbors' property had been contaminated by Olin.  It would appear impossible to harmonize such bewilderingly inconsistent positions.

analysis will be more complex than a simple formula, and that he has not performed sufficient research in this case to know whether application of these generically described methodologies can succeed. As to certain properties within the "zone of contamination," Dr. Simons acknowledged that no formulaic method is available, and that he will have to perform property-specific appraisals. (Exh. P-31, at 61-62.) He also conceded that, in identifying benchmark "before and after" market conditions, his efforts could be complicated by the need for inclusion of multiple dates, but that he has not determined what any of those potential dates might be as yet. (*Id.* at 127-28, 132-33.) Dr. Simons agreed that different information could have become available to the market regarding the contaminated or uncontaminated state of the properties in particular regions at different times, but that he does not know when those market effects occurred because he has not performed the analysis. (*Id.* at 149-50.) When pressed for specifics in certain aspects of the analysis, Dr. Simons commented that he would not know until the merits stage. (*Id.* at 173.) At one point, he candidly acknowledged, "I haven't done anything in this case yet." (*Id.* at 307.) Even under his own veiled methodology, Dr. Simons concedes that separate analyses would have to be performed for rental and industrial properties, including potentially individual-specific appraisals. (*Id.* at 186, 188-89.) Separate analyses would also have to be performed for crop lands and timber lands within the geographic boundaries of the class. (*Id.* at 193-94.) When asked how he would distinguish between diminution in property value resulting from contamination caused by Olin and diminution in property value resulting from contamination caused by other sources, Dr. Simons had no effective response except to reinterpret the question as relating to the possibility of dividing a "pot of money" at the "settlement stage." (*Id.* at 217-18.)[95]

    Any rational examination of the multitudinous factors that may impact each plaintiff's damages

_____

    [95]    Dr. Simons also testified that property values are impaired any time there are "detectable levels of contamination." (Exh. P-115, at ¶ 8.) But one would expect innumerable properties throughout the U.S. to show "detectable" levels of mercury, particularly in light of plaintiffs' expert testimony that background levels of naturally-occurring mercury average 10 - 50 ppb. In all likelihood, plaintiffs' properties had some baseline, detectable level of mercury before Olin ever built its chlor-alkali facility in 1952. Thus, Dr. Simons' apparent intent to ascribe damages to any properties where mercury is detected flies directly in the face of plaintiffs' stated position in this litigation regarding background concentrations.

award must conclude that damages in this case are not amenable to computation by an easy or essentially mechanical method.  Rather, those calculations will be fraught with peril, and will hinge on property-specific determinations of (a) whether the property is industrial, residential, commercial, agricultural, public, etc. in nature; (b) whether the property is contaminated;[96] (c) the extent of its contamination; (d) the pathway(s) of exposure; (e) the genesis and duration of its contamination; (f) where on the property the contamination is located;[97] and (g) the portion of that contamination attributable to Olin.[98]

---

[96]    Dr. Simons opined that proximity to a Superfund site may itself diminish property values.  (Exh. P-31, at 133.)  Plaintiffs' counsel asked a similar question of defense witness William Hall, who testified that it is impossible to generalize in that way.  (Tr., at 435.)  However, this dispute is immaterial, as plaintiffs' legal theories predicate diminution in property value on actual contamination, not the mere "stigma" of owning property near a contaminated site.  Plaintiffs have staked themselves to a position that mercury was deposited "upon **all of the properties** within an approximate 25 km radius from the Olin plant from 1952 to 1982."  (Reply Brief, at 10 (emphasis in original).)  Such emphasis on actual contamination is well-placed, given that, for example, Alabama law prohibits recovery on a trespass theory in the absence of an actual physical invasion.  *See Russell Corp. v. Sullivan*, 790 So.2d 940, 947 (Ala. 2001) ("In order to prove an indirect trespass, the plaintiffs here must show that some substance has entered upon the land itself, affecting its nature and character, and causing substantial actual damage to the *res*.") (citation omitted); *see generally Deramus v. Alabama Power Co.*, 265 So.2d 609, 614 (Ala.Civ.App. 1972) ("since the continuing presence of the transmission lines of appellee does not constitute a direct physical disturbance of any right enjoyed by appellants in connection with their property which gives it any additional value, any depreciation in the value of such property because of a public or personal fear or apprehension of the presence of such lines is not compensable").  Without the actual physical intrusion of mercury on each plaintiff's property, the legal foundation underlying their trespass and wanton trespass claims melts away.  Furthermore, if plaintiffs were proceeding on a "stigma" theory, surely any stigma and associated property devaluation would have attached no later than 1983, when the Olin plant was declared (amidst much fanfare and publicity) to be a Superfund site.  Plaintiffs clearly knew or should have known of any stigma damage to their property values by 1983; therefore, the time for bringing a lawsuit predicated on property value diminution resulting from mere proximity to a contaminated site has long since expired.

[97]    Presumably the market effects on property value would (or could) be different if mercury is found in a wooded area on the fringes of a large residential lot than if mercury is found in the kitchen or living room of a home.

[98]    An example illustrates the profound individualized difficulties inherent in ascertaining diminution in property value.  Suppose Plaintiff X purchased a home in the "zone of contamination" in

Clearly, then, individualized inquiry into damages issues appears inevitable.[99]  To be sure, the necessity for individualized damage determinations is not sufficient, in and of itself, to warrant a finding that classwide issues do not predominate over individual issues.  Nonetheless, as the Eleventh Circuit has recognized, "[i]t is primarily where there are significant individualized questions going to liability that the need for individualized assessments of damages is enough to preclude 23(b)(3) certification."  *Klay*, 382 F.3d at 1260.  That is precisely the situation here, inasmuch as both liability and damages

---

1980, and that mercury readings on X's refrigerator coils show 100 ppb of mercury today.  A threshold question is whether X has sustained any diminution in property value *following his acquisition of the property*, or whether the contamination at issue predated X's purchase of the land and had already been factored into the price of his home when he bought it.  Next, suppose Plaintiff Y purchased a home next door to Plaintiff X in July 2003, and that mercury readings on Y's refrigerator coils also show 100 ppb of mercury today.  The same threshold question should be asked as to whether Y's property value has been diminished following his purchase of it, but the answer may be different than for X, resulting in very different damages calculations for the two.  Simply put, the timing of a plaintiff's acquisition of the property relative to the timing of any diminution in value of that property is just one of the myriad variables that will have to be weighed in calculating damages.  Such factors would appear to defy simplification into a mere mechanical formula, but would instead require intensive inquiry into each plaintiff's individual damages situation.

[99]    To the extent that plaintiffs fall back on Dr. Simons' conclusory statement that "the property values affected by the contaminants in the McIntosh area can be modeled and calculated on a class-wide basis through a common, formulaic methodology as to all the property owners in the proposed class," (Exh. P-48, at 13), the Court rejects that statement as contrary to Dr. Simons' deposition testimony (as set forth *supra*) and irreconcilable with a common-sense view of the kinds of technical and practical issues inherent in computation of diminution in property value because of Olin mercury contamination.  *See, e.g., Corley*, 220 F.R.D. at 486 (observing that computation of damages for trespass to land requires examination of individual circumstances).  In the vernacular of Rule 23 proceedings as described in the *Visa Check* decision set forth *supra*, the Court finds that the portion of Dr. Simons' testimony that asserts in conclusory form, with no underlying analysis, that common, formulaic methods can compute diminution in property values for all proposed class members is so flawed as to be inadmissible as a matter of law.  In so ruling, the Court does not disqualify Dr. Simons as an expert or prevent him from furnishing expert opinions as to diminution in property values in this case.  Rather, the Court merely finds that Dr. Simons' intimation in his report that a simple, mechanical formula can compute diminution of property values for all plaintiffs is belied by his deposition testimony, undermined by his vagueness, and thwarted by any common-sense examination of the practical realities. Full-blown assessment of Dr. Simons' qualifications and methodology under *Daubert* will be reserved until the appropriate time.

determinations are chock full of individual-specific inquiries. Thus, the need for individualized damages calculations, when combined with the numerous liability and limitations issues requiring plaintiff-by-plaintiff scrutiny, counsels strongly against class certification pursuant to Rule 23(b)(3).

            5.    *Conclusion.*

        Without question, there is a certain core nucleus of common facts in this case, encompassing such issues as whether Olin released mercury, when it released mercury, where the mercury went, and what efforts Olin made to notify the community or conceal such releases. Adjudication of such common factual issues would establish background facts, but little else.[100]  Proof of the classwide facts would neither establish defendants' liability to any class member nor fix the level of damages awarded to any plaintiff. The common facts would not establish a single plaintiff's entitlement to recover on any theory of liability, or even show that a single plaintiff is aggrieved. Even after the common proof was made, each plaintiff would still have to prove individually that his property is contaminated, that the contamination came from Olin, and that he was aware of and relied on Olin's misrepresentations to his detriment. The Court would have to fix separate FRCDs for each plaintiff. After resolving the individual liability and timeliness issues, the damages inquiry would be carried out at the individual level. Notwithstanding class status, the clear weight of the proof for a given plaintiff's claims would be individual in nature. Thus, class certification would snarl, delay and complicate this action beyond all recognition, spawning inquiries into liability, causation, reliance, timeliness and damages that would

---

[100]  Although plaintiffs protest that "the amount of repetition would be unjustified and inefficient" (Plaintiffs' Brief, at 82) if plaintiffs' cases were tried separately, this fear is unfounded. Plaintiffs express concern with the need for duplication of proof concerning "the history and operation of Olin's facilities; the nature, timing, extent, and cause of contamination; and the generalized impact of the facilities' operation on real property values." (*Id.*)  The Court has little doubt that the parties can stipulate to the first category of facts, as well as substantial portions of the second category (*i.e.*, that substantial quantities of mercury disappeared from Olin during the 1960s and thereabouts). Even if no stipulation were reached, proof on the common issues could be presented in straightforward fashion using readily available record materials. Proof concerning the "cause of contamination" and the "impact of the facilities' operation on real property values" will necessarily be individualized for the reasons described herein. Thus, while there would be some overlap, the Court does not share plaintiffs' concern that massive amounts of redundant proof would be required from one case to the next if these actions were tried individually.

require adjudication on a plaintiff-by-plaintiff basis.  Far from saving time, class treatment of this action would result in any efficiencies being washed away by torrents of paralyzing individual determinations multiplied across hundreds of class members.  Simply put, if litigated as a class action, this case would break down into an unmanageable variety of individual legal and factual issues.  Given the myriad sources of harm, types of harm, and damages resulting from harm, individual issues dwarf whatever common issues there may be, such that a vast array of mini-trials would be required for each class member if certification were granted.  Accordingly, it is the opinion of the undersigned that the predominance problem is fatal to plaintiffs' bid for class certification.  Stated differently, the Court finds that questions of law or fact common to members of the class do not predominate over any questions affecting only individual members, and that certification of a class under Rule 23(b)(3) is therefore inappropriate and unwarranted.

A helpful analogy may be found in *Georgine v. Amchem Products, Inc.*, 83 F.3d 610 (3rd Cir. 1996), a personal injury case involving asbestos exposure.  In determining that Rule 23(b)(3) predominance was not satisfied, the *Georgine* court noted that, although there were broadly common issues (*i.e.*, whether defendants knew of the hazards of asbestos, whether they had adequately tested, etc.), class members' claims varied widely based on such variables as differential exposures for different lengths of time, in different ways, and over different periods, as well as differences in the manifestations of harm (*i.e.*, some plaintiffs had suffered physical injury, other plaintiffs had not).  The same is true here.  Certainly, there are shared factual issues (*i.e.*, did Olin release mercury, how much, over what period of time, through what pathways, etc.).  But each class member's claims may be expected to vary widely depending on such factors as whether their property is contaminated at all, the extent of contamination, the causation of such contamination, when each class member knew or should have known of the contamination, and the extent to which each class member has sustained property damage.  As in *Georgine*, these factual differences translate into significant legal differences, including causation, limitations, and damages.  The *Georgine* panel astutely observed that "the individualized issues can become overwhelming in actions involving long-term mass torts (*i.e.*, those which do not rise out of a single accident)," thereby rendering Rule 23(b)(3) certification problematic and inappropriate.

83 F.3d at 628.[101]

That said, the Court is well aware that case authority is not uniform in its method of application of Rule 23(b)(3) to property damage cases involving alleged environmental contamination.[102]  The Court further recognizes that some courts have minimized the types of concerns articulated here as insufficient to swing the predominance pendulum against class certification.  *See, e.g., Olden v. LaFarge Corp.*, 383 F.3d 495, 508-09 (6th Cir. 2004) (Rule 23(b)(3) standard satisfied where

---

[101]     Similar findings have been reached in various cases where plaintiffs sought to recover for alleged property devaluation stemming from environmental contamination.  For instance, in *Church v. General Elec. Co.*, 138 F. Supp.2d 169 (D. Mass. 2001), plaintiffs were landowners who sought to recover damages under nuisance and trespass for alleged PCB contamination of their properties emanating from defendant's factory.  In declaring that Rule 23(b)(3) predominance was not satisfied, the *Church* court pointed out that plaintiffs' claims would require expert measurement of the contamination of each individual property, considering the characteristics of each property, and that each property's contamination level would differ.  Tellingly, the court reasoned, "[t]hese differences pertain not just to damages, as plaintiffs argue, but to the threshold question of whether the contamination constitutes a nuisance or trespass," thereby warranting denial of class certification on predominance grounds.  *Id.* at 182.  *See also Martin v. Shell Oil Co.*, 198 F.R.D. 580, 592 (D. Conn. 2000) (individual issues predominated over class issues where property owners sued gasoline station for groundwater contamination, inasmuch as individualized proof of causation would be necessary for each plaintiff to show that defendants' MBTE leakage reached that plaintiff's property and, if so, to what degree); *Thomas v. FAG Bearings Corp. Inc.*, 846 F. Supp. 1400, 1404 (W.D. Mo. 1994) (finding that individual issues predominated in case involving TCE groundwater contamination, where diminution in property value and other issues required individualized proof, thereby precipitating "hundreds or thousands of individual mini-trials on complex causation and damages issues, while the only benefit of a class would be that the ruling of several common, but not particularly daunting issues, would be made applicable to the entire class"); *see generally Bieneman v. City of Chicago*, 864 F.2d 463, 465 (7th Cir. 1988) (declining to certify class alleging airport noise, where magnitude of effect depends on many individual-specific variables, notwithstanding presence of common questions).

[102]     The Court likewise proceeds in full recognition of the pragmatic truth that one cannot harmonize every interpretation of Rule 23 announced by every federal court in every factual scenario. There are simply too many justifiable, defensible points of view propounded by too many wise jurists. When all is said and done, the Court applies Rule 23 principles to this action as fairly and evenly as it can.  But <u>any</u> of the possible resolutions of those issues will find both praise and condemnation in the attendant caselaw, so this decision offers no pretense of enjoying universal support in the extant authorities.

-74-

common issues of emission of pollutants and causation of harm could be determined on classwide basis, while damages issues were left for individuals); *Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910 (7th Cir. 2003) (individual questions as to whether TCE contamination reached class members' property, harm suffered by class members and the like held not to predominate over classwide issues such as whether defendant leaked TCE in the first place). Unlike the circumstances present in the *Olden* and *Mejdrech* lines of authority, wherein causation could be determined on a classwide basis, here causation turns on highly individual-specific determinations. Mercury may be emitted by many sources, natural and manmade, in the McIntosh area. It could come from the local incinerator, from the nearby electric power plants, from various household products, or from the earth's crust. This fact will necessitate an individualized inquiry for each and every plaintiff to ascertain (a) whether mercury is on his property and, if so, how much; (b) where the mercury came from; and (c) the extent of damages. Plaintiffs have not offered any means of reducing the causation question to one amenable to classwide determination; therefore, the *Olden/Mejdrech* reasoning is inapplicable.[103]

### B.    Superiority Requirement.

The final prong of the Rule 23(b)(3) analysis requires a finding of whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Id.* This

---

[103]    The causation issue is critical. For example, the *Olden* court emphasized the lack of evidence of any other sources for the toxins at issue, as well as the lack of any showing that toxins from other sources would be indistinguishable from those emitted at the LaFarge plant. *See Olden*, 383 F.3d at 508. Likewise, in *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188 (6th Cir. 1988), on which plaintiffs rely, the court concluded that "the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs." *Id.* at 1197; *see also O'Connor v. Boeing North American, Inc.*, 184 F.R.D. 311, 340 (C.D. Cal. 1998) (holding that plaintiffs adequately addressed individual causation concerns by showing that proximate cause could be proven on a classwide basis via questions that will not differ with each class member's claims); *but see Ludwig v. Pilkington North America, Inc.*, 2003 WL 22478842, *5 (N.D. Ill. Nov. 4, 2003) (rejecting notion that existence of multiple sources and manners of contamination precludes Rule 23(b)(3) certification). That is manifestly not the case here, given the myriad potential emission sources of mercury and the apparent difficulty (if not impossibility) in scientifically tracing that mercury back to any singular source simply by studying a sample. Thus, unlike in *Sterling* and cases of that ilk, causation will have to be determined individually for each plaintiff.

-75-

criterion contemplates consideration of the "relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Klay*, 382 F.3d at 1269.[104]

The Court's analysis of the superiority element ends almost before it begins. As the late Judge Vollmer explained, "superiority analysis is 'intertwined' with predominance analysis; when there are no predominant common issues of law or fact, 'class treatment would be either singularly inefficient ... or unjust.'" *Shelley v. AmSouth Bank*, 2000 WL 1121778, *8 (S.D. Ala. July 24, 2000) (quoting *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1006 n.12 (11th Cir. 1997)); *see also Klay*, 382 F.3d at 1269 (observing that predominance analysis has "tremendous impact" on superiority analysis); *Cooper*, 390 F.3d at 723 (indicating that where issues subject to individualized proof predominated, that finding rendered Rule 23(b)(3) class action procedure not superior for fair and efficient adjudication). Simply put, the non-predomination of common issues over individual issues renders the class action vehicle distinctly ill-suited as a means of adjudicating plaintiffs' claims. Because of the tremendous array of individualized determinations necessary for plaintiffs' claims, this case is unmanageable as a class action, as it would become mired in an endless procession of individual-specific mini-trials dwarfing the classwide issues compelling utilization of the class action framework in the first place. The Court therefore has no hesitation in concluding that this case fails Rule 23(b)(3)'s superiority requirement. *See Kirkman v. North Carolina R. Co.*, 220 F.R.D. 49, 54 (M.D.N.C. 2004) (given the variety of potentially impacted commercial, rural, and urban property, and given complexity of issues of ownership, liability, and damages, "[a] class action is simply not the superior way to handle this litigation").

## VII.   Rule 23 Analysis of Class B.

Having exhaustively addressed whether class certification is appropriate as to Class A, the Court now turns to Class B, the so-called "Fish Class." Plaintiffs would define the Fish Class as consisting of "all commercial, recreational, or subsistence fishermen who, as of the date of certification

---

[104]    Curiously, the discussion of superiority issues in both sides' briefs display little of the ardor and zeal that otherwise characterized their written submissions. Of the 200 pages of briefing on class certification issues, the parties offered, in total, roughly 2 pages of discussion relating to Rule 23(b)(3)'s superiority requirement.

of this class in this matter, fished in the areas of the natural basin known as the Olin Basin or in the Tombigbee River within the geographic boundaries of Class A." (*Id.* at 9.)  In these proceedings, the Fish Class has been no more than an afterthought.  During the two-day class certification hearing, plaintiffs presented vanishingly little (if any) evidence or argument relating to the Fish Class.  Moreover, discussion of the Fish Class in the pleadings and briefs has been sporadic (as evidenced by plaintiffs' virtually complete omission of evidence or argument relating to Class B in their 84-page principal brief), and plaintiffs have undertaken little effort to explain why they believe class certification is warranted for the Fish Class.  Upon closer scrutiny, it becomes readily apparent that Class B is ill-conceived and ill-described, a mere "tagalong" class that plaintiffs have expended minimal effort to develop.[105]  The Fish Class suffers from gaping conceptual, definitional, and evidentiary flaws that render it wholly inadequate to satisfy the prerequisites of standing and definability, as well as the Rule 23(a) and Rule 23(b) standards.  As plaintiffs have not endeavored to present a cogent basis for certifying Class B, the Court finds it unnecessary to devote extensive treatment to its patent infirmities.  Rather, a brief, illustrative discussion of a sampling of those defects will suffice.

### A.    *Plaintiff Jordan Lacks Standing to Pursue Claims on Behalf of Class B.*

The lone named plaintiff who apparently purports to represent the interests of the Fish Class is Lee Edward Jordan, who is identified in the Third Amended Complaint (doc. 68) as "a fisherman who fishes in the Tombigbee River and/or its tributaries.  Plaintiff ingested fish from the Tombigbee River.  Lastly, Plaintiff earned income selling fish from the Tombigbee River.  Upon information and belief, the Tombigbee River and/or its

---

[105]    For example, plaintiffs would have the Fish Class pursue trespass claims even though there is no allegation that the Fish Class owned the allegedly contaminated bodies of water; to the contrary, the evidence is that the Tombigbee River is a public waterway and the Olin Basin is owned by Olin. (Exh. D-451.)  Likewise, despite announcing the kinds of damages they seek on pages 50-52 of their principal brief, plaintiffs have failed to explain the types or categories of damages sought by members of the Fish Class, as to whom a "diminution in property value" measure of recovery would clearly be inapplicable.  These and other inconsistencies are symptomatic of plaintiffs' apparent failure to invest significant effort into sculpting the form of the Fish Class or integrating it into their class certification request.

tributaries have been contaminated by materials from the Defendants' sites and Plaintiff Jordan's income has been adversely affected by Defendants' actions and/or inactions." (Third Amended Complaint, ¶ 35.) Jordan is a commercial fisherman who operates his own retail seafood business some 12 miles south of McIntosh. (Exh. P-14, at 8, 9.)

Plaintiff Jordan's standing problems are twofold. First, Jordan's claims are untimely. In his deposition, he testified that it has been "common knowledge" since 1998 or 1999 that one should not eat fish caught in the Olin Basin because of mercury contamination. (Exh. P-14, at 74-76.)[106] He further testified that, beginning in or about 1999, he began hearing from his customers that they did not want to purchase his fish if he caught them from the Tombigbee River. (*Id.* at 76-77.) Clearly, Jordan was on notice of his claims against Olin for contaminating the waterways where he earned his living by no later than 1999, or four years before the lawsuit was filed. As all of the Class B claims are subject to a two-year statute of limitations (there being no conceivable likelihood that the Fish Class could interpose trespass claims), Jordan's claims are clearly untimely. As such, he lacks standing to represent the class.

Second, and alternatively, Jordan is deprived of standing because there has been no showing that he has been detrimentally affected by Olin's alleged actions. It appears that Jordan continues to fish on the Tombigbee River today, and to sell his catch to customers.[107] The record further establishes

---

[106]    According to Jordan, if one were to choose 100 different people in the McIntosh area at random, and ask each of them whether it was safe to eat fish caught in the Basin, "ninety-five out of hundred is going to tell you no. Don't eat the fish out of the basin because of the mercury." (Exh. P-14, at 75.)

[107]    Plaintiffs' representations on their ability to continue fishing in the challenged waterways are conflicting and confusing. Plaintiffs represent that "the Tombigbee River near the Olin Basin is now closed to fishing because of mercury and other chemicals of concern from the Olin plant." (Plaintiffs' Brief, at 25 n.18.) In the next breath, however, plaintiffs indicate that "residents of this area fish for food in the Basin and in the River" to this day. (*Id.* at 25.) Plaintiffs' own statements to the Court suggest that members of the Fish Class continue to fish out of the River in the alleged area of contamination today, so it is unclear how they have incurred any injury in fact through Olin's alleged misdeeds. Jordan himself answered affirmatively when asked whether he presently fishes the Tombigbee River. (Exh. P-14, at 48.) His testimony is that he currently fishes in the River near the Olin facility on a regular basis. (*Id.* at 60-61.) Moreover, he testified that only 2-3 of his customers

-78-

that there are alternative non-contaminated fishing areas within a reasonable distance of his Mt. Vernon home and business (12 miles south of the Olin plant). (Exh. P-14, at 45-50.) The record is silent as to whether his average daily fish catch is lower than it was before 1998 and 1999, whether his revenue from the sale of fish has declined, whether his profits have fallen and the like.[108] Simply put, it would be logical for a commercial fisherman who learned that the Basin was contaminated to pick another fishing spot, where presumably he could catch the same volume of fish without worrying about Olin-induced mercury contamination. Absent any suggestion that there are no reasonable alternative locations for Jordan to ply his trade, that he is unable to fish where he previously did, or that his business has been damaged, he cannot show actual harm, and he has not incurred an injury in fact.[109] If anything, Jordan appears upset that he is not catching as many fish as he once did, and that he is forced to take multiple trips for his daily catch. (Exh. P-14, at 62.) But plaintiffs have neither argued nor offered proof that Olin-produced mercury has reduced the quantity of fish in the Tombigbee River.[110]

_____

per month express reservations about purchasing fish caught in the River. (*Id.* at 62.)

[108]    The dearth of this kind of critical information to establish standing is an unfortunate but predictable consequence of plaintiffs' failure to focus on Class B, or to make any reasonable effort to establish the legal prerequisites to certification for that class.

[109]    A separate rationale for declaring that Jordan has not sustained an injury in fact is that plaintiffs' own test results do not reveal that fish caught in the challenged areas are contaminated by mercury to unsafe levels. During testing of the McIntosh area, Kaltofen caught two fish, a bass and a gar, in the challenged waterways. The bass showed mercury contamination levels of less than 1 ppm, while the gar (a long, skinny fish, often with an elongated protruding snout) showed mercury levels of 1.63 ppm. Plaintiffs' expert, Kaltofen, testified that the mercury health standard for fish tissues is 2 ppm. (Tr., at 250-52.) Because both fish samples were below that threshold, plaintiffs' testing does not support their position that the fish populations are contaminated to the point of being harmful to the activities of commercial, recreational and subsistence fishermen in the McIntosh area. Even if the gar sample were above the FDA action level, this result would not give rise to an injury in fact because plaintiff Jordan did not testify that he fishes for or sells gar. Although gar are edible, they are not popular as seafood and are generally not eaten by humans; indeed, a 1993 McIntosh fish survey suggests that McIntosh residents neither fish for nor catch gar. (Exh. P-16, at 250-51; Exh. D-110.)

[110]    Even if plaintiffs were alleging that Class B was damaged by a decline in fish populations, Jordan's testimony precludes attribution of this development to Olin. According to Jordan,

-79-

Thus, the Court concludes that plaintiff Jordan lacks standing to represent the Fish Class because his claims are untimely and he has failed to make any showing of an injury in fact. Because Jordan is the only named class representative for Class B, his lack of standing is fatal to plaintiffs' efforts to certify Class B.

### B.     Class B is Not Adequately Defined.

Even if Jordan possessed standing, the request for class certification would fail nonetheless because Class B is so poorly defined that its membership would be difficult, if not impossible, to ascertain. The proposed class definition is inadequate in at least four respects. First, its geographic scope is so amorphous that plaintiffs themselves lack fixed notions as to its reach. In their principal brief, plaintiffs define the class as consisting of all fishermen who "fished *in the natural basin known as the Olin Basin* or in the Tombigbee River within the geographic boundaries of Class A." (Plaintiffs' Brief, at 9 (emphasis added).) Presumably in support of this contention, plaintiffs offered affidavits of several putative class members who fish or did fish in the Basin. (Exhs. P-108, P-109, P-110.) Upon being confronted with evidence that the Olin Basin is private property owned by Olin, plaintiffs abruptly changed their tune, insisting that the Fish Class does not embrace fishermen within the Olin Basin, but is and always has consisted of fishermen who "fished *in the areas of* the natural basin known as the Olin Basin or in the Tombigbee River within the geographic boundaries of Class A." (Reply Brief, at 41 (emphasis added).) Given that plaintiffs themselves treat the geographic boundaries of Class B as shifting with the exigencies of the moment, the Court cannot find that this class has been adequately defined.[111]

---

the decline has been confined to drum fish and has happened only in the last four years, or fully two decades after the cessation of Olin's mercury operations. (Exh. P-14, at 86-87.) There is no evidence linking Olin's activities between 1952 and 1982 to the sudden decline in the drum fish population beginning in 2000 or 2001, which is the harm about which Jordan complains. (*Id.* at 88-89.) He therefore has not sustained any injury in fact that may be fairly attributed to Olin's activities.

[111]     Plaintiffs' quandary is that Olin agrees that people should not consume fish caught in the Basin because of elevated mercury exposure (Exh. P-24, at 79; Exh. P-28, at 244), but the Basin is private property where the public has no legal right to fish. (Exh. P-28, at 244.) This fact is reinforced by Olin's posting of signs since 1993 prohibiting fishing on its property, including the Basin. (Exh. P-

Second, the temporal scope of the Fish Class is even more problematic. According to plaintiffs, Class B embraces fishermen "who, as of the date of certification of the class in this matter, fished" in the waterways of concern. (Plaintiffs' Brief, at 9.) The Court cannot tell what that means. Is Class B limited to fishermen who actually fish in the River on the actual date of entry of the Class Certification Order? Does it extend to cover all fishermen who fished in those waterways during the one-week period before entry of the Class Certification Order? One month? One year? Does it include every fisherman who ever fished in those waterways? Plaintiffs' hopelessly vague, ambiguous definition of Class B obstructs any reasonable answer to those questions.[112]

Third, the class definition does not purport to define what a "commercial," "recreational" or "subsistence" fisherman is. These terms are all subject to their own definitions, none of which have been provided. Thus, the Court cannot determine whether plaintiffs intend for Class B to encompass each and every person who has cast a fishing line into the River, or whether plaintiffs intend simply to incorporate certain categories of fishermen into Class B. Nor is it reasonably possible with this amorphous terminology to ascertain the category in which a particular fisherman belongs. Presumably, the same person may fish for all three of these purposes.

Fourth, the Court is of the opinion that, however plaintiffs might attempt to repair these definitional defects, it would be administratively burdensome to identify class members. Plaintiffs wave away this issue, suggesting that members of this class can be readily identified via licensing information

_____

67.) By contrast, plaintiffs' evidence that the activities of fishermen in public waterways near Olin have been curtailed by fish contamination is much sketchier. The Court recognizes evidence that McIntosh residents do trespass in the Basin to go fishing. (Exh. D-109, at 32.) Such trespassing, however, does not confer a legal right on the trespassers to fish in a mercury-free Basin, or to recover damages if contamination in the Basin inhibits their ability to harvest the fruits of their trespassing activity to the degree that they once could.

[112]     In response to defendants' objection that Class B lacks a temporal boundary, plaintiffs state only that the class "do[es] not lack a temporal boundary, " that "quite the opposite is true," and, in an unhelpful *non sequitur*, that "[t]he members of Class B can be ascertained in a number of ways, for example, professional licensing information and/or publication notice." (Reply Brief, at 47-48.) Plaintiffs thus respond only in conclusory form to defendants' objection that they cannot determine the intended timeframe for the Fish Class.

or publication notice. (Reply Brief, at 48.) But licensing information may not pick up all fishermen. Even if it did, such information may reveal little to no data about who was actually fishing in a particular section of the River on a particular day or in a particular time interval. Plaintiffs furnish the Court with no inkling as to what information may be available via licensing records. Similarly, publication notice may be both overinclusive and underinclusive in identifying class members, as not all of them may read the paper and certain people may respond to publication notice even though they were not fishing in the particular area of concern during the particular temporal interval of concern. In the absence of public records or other objective criteria allowing for easy identification of class members, courts are leery of engaging in the sort of fishing expedition proposed by plaintiffs. *See, e.g., Perez v. Metabolife Intern., Inc.*, 218 F.R.D. 262, 269 (S.D. Fla. 2003) (rejecting class definition where individual mini-trials would be needed just to determine class membership, given that passenger lists, employment records or public records could not be used to confirm membership in proposed class).

        For all of the foregoing reasons, it is the opinion of the undersigned that plaintiffs' proffered definition of Class B is overly broad, amorphous, and vague, and would engender substantial administrative difficulties in making individualized determinations required to ascertain the class status of particular putative class members.

        **C.**        ***Plaintiffs Have Failed to Show Numerosity or Typicality as to Class B.***

        Even if the preconditions of standing and definability were satisfied, Class B would be unable to overcome at least two of the Rule 23(a) hurdles. On the subject of numerosity, the record divulges no clue as to how many class members might fall within the parameters of the Fish Class. The Court has no way of knowing whether one, 10, 100, or 1,000 persons might be Class B members. In response to defendants' numerosity objection, plaintiffs simply state in conclusory terms that "Plaintiffs have shown that there are hundreds, if not thousands, of putative class members that fit the criteria of the class definitions." (Reply Brief, at 49.) No such showing has been made as to the Fish Class, and the Court is of the opinion that plaintiffs have failed to meet their burden of showing that joinder of all members of Class B is impracticable. The numerosity requirement has not been satisfied.

        Likewise, the Court harbors substantial concerns to the typicality of Jordan's claims. By his

own admission, he is a commercial fisherman. From the limited record before it, the Court has no basis for concluding that the interests of a commercial fisherman are aligned with those of a subsistence or recreational fisherman, that each would be advancing the same legal theories, or that each would be subject to the same defenses. Because plaintiffs have neglected to present evidence from which a finding of typicality could reasonably be made, the Court concludes that they have not satisfied their burden under Rule 23(a)(3) with respect to the Fish Class.

D.     *Predominance is Lacking.*

Finally, even if plaintiff Jordan had standing to bring claims on behalf of Class B, even if Class B were defined with satisfactory precision, and even if the Rule 23(a) criteria were satisfied, certification of the Fish Class would remain improper because plaintiffs have not shown that common issues predominate over individual issues. There is no indication in the record that the alleged contamination of the River by defendants has affected different categories of fishermen, or even fishermen in the same category, in the same way. By plaintiffs' own admission, at least some of those fishermen continue to fish in the very areas of the River that plaintiffs contend has been contaminated by Olin. Perhaps others do not. The impact of the alleged Olin-caused contamination may be different in different fishing spots frequented by different fishermen. It may also differ depending on the kinds of fish that different fishermen may catch. Some fishermen may be bass fishermen, others may be gar fishermen, and the like, and the levels of contamination in those types of fish may vary markedly. Certain fishermen may have been able to mitigate harm by simply fishing elsewhere, while others may not. Fishermen who fish in the Basin may have no actionable claim for relief at all (if they are even Class B members, which cannot be determined using plaintiffs' inconsistent statements), given the evidence that the Basin is private property owned by Olin. Additionally, damages calculations would almost certainly be individualized for all members of Class B.

There is no indication that plaintiffs have taken these considerations into account, or that any classwide issues regarding Olin allegedly dumping mercury contamination into the Basin and River are sufficiently extensive to predominate over those individualized determinations. On this record, the Court cannot find that plaintiffs have satisfied Rule 23(b)(3) as to the Fish Class, given the paucity of

-83-

evidence that classwide issues predominate over their individualized counterparts.

In light of these myriad concerns regarding timeliness, injury in fact, definability, numerosity, typicality and predominance, it is the opinion of this Court that Class B represents an amorphous, ill-defined, poorly considered attempt to implement a "tagalong" class, without regard to the exacting legal prerequisites for class status under Rule 23 and applicable law. Whatever plaintiffs' reasons might have been for appending such an afterthought class, their showing has been wholly inadequate on many different yardsticks to sustain class certification for Class B. This is not a close question. Plaintiffs are not entitled to certification of Class B, as a matter of law.

**VIII.  Conclusion.**

For all of the foregoing reasons, plaintiffs' Motion for Class Certification (doc. 119) is due to be, and the same hereby is, **denied**. Plaintiffs' Motion in Limine to Exclude Limitations Evidence (doc. 163) is **denied**.

DONE and ORDERED this 10th day of November, 2005.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE